SOTO, et al.

v.

**UNITED STATES**

No. 2660

Circuit Court of Appeals

Third Circuit

June 7, 1921

*See, also, 273 Fed. 628*

LEO. F. S. HORAN, St. Thomas, V.I. (Dallas S. Townsend, New York City, of counsel), *for appellants*

GEORGE A. KEYSER, Government Attorney, St. Croix, V.I., *for the United States*

Before BUFFINGTON, WOOLLEY, and DAVIS, *Circuit Judges*

WOOLLEY, *Circuit Judge*

This is a criminal appeal from a judgment of the District Court of St. Thomas and St. John in the Virgin

Islands, formerly the Danish West Indies. It is brought here under the Act of Congress of March 3, 1917 (ch. 171, § 2, 39 Stat. 1132; 48 U.S.C., 1946 Ed., § 1392), which conferred on this court appellate jurisdiction in all cases arising in those islands. By the judgment appealed from, Lopez was found guilty of murder and was sentenced to death; Soto was found guilty of being an accomplice and was sentenced to imprisonment for six years. The appeal brings the case here for review on both the facts and the law after the manner of appeals to the courts of Denmark, as provided by the cited Act, construed by this court in Clen v. Jorgensen (1920) 1 V.I. 497, 165 Fed. 120.

The main question in the case is whether constitutional guarantees (especially those contained in the Fifth and Sixth Amendments) extend to inhabitants of the Virgin Islands.

The facts out of which this important question has arisen are briefly these:

On the night of September 9, 1920, the American Steamship Polar Star was lying in the Harbor of St. Thomas. Upon the sounding of her distress signal the local police hurried aboard and found a man lying dead in the mess-room and another man on the deck badly wounded. Two of the crew, Soto, a Chilean, and Lopez, a Spaniard, were missing. These men were captured in the bush, one a day, and the other two days, after the homicide. On the day following the homicide a Police Investigation was instituted in the Police Court of St. Thomas and St. John. The investigation was begun before Soto and Lopez had been apprehended and was continued after their capture and production in court by repeating before them the testimony given, or "reports" made, in their absence and by introducing additional testimony, the substance of which was as follows:

There was a quarrel in the crew's quarters below deck

between Soto and Lopez on one side and William Dougherty and Patrick Donahue on the other. The four men were members of the crew. All were more or less under the influence of liquor. In the course of the quarrel it was proposed that they go on deck and fight it out. Thereupon the men started for the deck. Soto, gaining possession of a large knife, handed it to Lopez. When on a stairway, or in a narrow passage, Lopez stabbed Donahue, who was above him or ahead of him, and then stabbed Dougherty, who was below him or behind him, with the result that Donahue suffered the loss of an eye and Dougherty was instantly killed.

While these were the main facts, there was much testimony bearing on the grade of the crime. The investigation continued almost daily from September 10 to September 22. Twenty-three witnesses for the government were examined; the prisoners alone spoke for themselves.

The proceeding before the Police Court has an important bearing on the case. The best that we can make out of the record is that it was purely an investigation looking toward discovering and committing the culprits. No charge of crime was made against anyone. As to the procedure, a witness on being called gave his testimony, which afterwards was reduced to writing and read to him, and, if satisfactory, was verified by his oath. The testimony of witnesses was at times read by an interpreter to the prisoners, both of whom spoke and understood nothing but the Spanish language; and at times, as the record shows, the testimony was not read to them at all. The investigation was prosecuted mainly in the presence of the prisoners, though, undoubtedly, the record shows that it continued at times during their absènce. (Testimony of Patrolman Anduze and Director of Police Morningstar on September 13.)

At the conclusion of the proceeding in the Police Court,

that is, at the conclusion of the "Policy Investigation," for that is what it was entitled, the judge made the following entry:

"The two accused (sic) were informed that in case they have no further statement to give the investigation will be closed now and the records of it sent to the Government with the request that they be tried for murder."

The case was then transferred from the Police Court to the District Court by the appearance in the latter court of the Government Attorney, who had conducted the police investigation, and by the filing of "a summons, a plea, a transcript of the police investigation in the case and the order for prosecution." Judge Thiele (who was Judge of the District Court as well as of the Police Court) thereupon issued a summons to Soto and Lopez to appear on a named day "to answer the charge made against (them) and show cause why (they) should not be punished as recommended to the court by the prosecution in the plea filed with this Court." The "plea" which the Government Attorney filed in the District Court recited the facts of the homicide and charged Lopez with "intentional murder" in killing Dougherty and Soto with being an accomplice. The plea charging these crimes was later amended by adding the charge of assault and battery. The two prisoners were then brought to the bar and "made acquainted" with the charges against them. Counsel for their defense, having but recently been appointed by the Government, appeared for the first time and requested a postponement of the trial in order that he might familiarize himself with the transcript of the proceeding in the Police Court and prepare a plea by way of answer. Thereafter the trial proceeded by both counsel filing pleas made up entirely of discussions on the evidence taken in the police investigation. In other words, the pleas were arguments in the nature of briefs.

At the trial in the District Court no witnesses were produced by the Government and no testimony was given. Similarly, no witnesses were produced by the prisoners, although at the trial (as well as at the police investigation) the defendants were afforded an opportunity of calling witnesses in their defense. This offer at the trial was of no value to them as the Polar Star had by that time sailed away with all the witnesses to the homicide.

The case in the District Court was tried to the District Judge and four "co-judges," or lay-judges, whom the Judge had summoned to his aid. The five judges found the defendants guilty respectively of "willful and unnecessary murder" and of being accessory to that crime, and concurred in a judgment that —

"The defendant Jose Lopez shall lose his life and that the defendant Jose Soto shall be punished by imprisonment in the penitentiary for six years."

This appeal followed.

■ While it is our duty on an appeal of this character to review the case on both the law and the facts, Clen v. Jorgensen, supra, we desire to say that, if a question of law were not involved, we should not disturb the judgment of the District Court on the facts. The facts, as they stand are of a character on which equally fair-minded men might come to the one conclusion that Lopez killed Dougherty, and yet are such that equally fair-minded men might come to different conclusions as to the grade of the crime, whether, as in our law, it be manslaughter, murder in the second degree, or murder in the first degree. Therefore, we cannot say that, on the evidence before them, the trial judge and the co-judges erred in rendering against Lopez a judgment of "intentional murder" — in effect a verdict of murder in the first degree.

This brings us to the question of law involved in the appeal. Before discussing this very important question

541

we shall state, with some repetition, the salient parts of the two separate and distinct proceedings below which bear on the question.

The first proceeding was, as its title denotes, a "Police Investigation." It was instituted before one judge who alone had no power to convict, and was begun before the prisoners were apprehended. It was conducted mainly in their presence but at times during their absence. The prisoners were without counsel, and it is not clear that they were given an opportunity to cross-examine the witnesses, though called upon at the conclusion of the testimony of each witness to make "explanation," indicating apparently an opportunity for them to explain or deny what the witness had just said, and affording them, perhaps — as the Government Attorney maintains — an opportunity of cross-examination. As the proceeding was in every sense an investigation and in no sense a trial, the prisoners were inclined to remain silent, thereby imposing upon the Government, as they had a right to do, the burden of establishing a prima facie case of guilt. The investigation was concluded by a finding, not of their guilt, but that "the records be sent to the Government with the request that they be tried for murder." This, obviously, was nothing more than a formal commitment.

Thereafter, the Government Attorney appeared in the District Court and filed a transcript of the Police Investigation and a plea formally charging the defendants with several crimes. The plea evidently served the purpose of an indictment or information in our law, and was the first act by which the defendants were charged with crime. After a procedure suggestive of calling upon the defendants to plead, the trial was begun before the District Judge and four lay-judges. It was conducted on pleadings, or rather on arguments, based solely on the record of the Police Investigation, and was concluded by a judgment of

conviction without four of the judges having seen or heard the witnesses, without confronting the defendants with witnesses, without producing any testimony except that contained in the transcript of the Police Investigation, and without affording the defendants an opportunity of cross-examining the witnesses on whose testimony they were convicted and sentenced.

The question of law arising on such procedure is, broadly stated, whether the defendants were tried and convicted according to law.

What law?

The law governing judicial proceedings in the Virgin Islands is declared by the Act of Congress of March 3, 1917 (supra), locally known as "the Organic Act." By this Act (section 2, supra) it is provided:

"That until Congress shall otherwise provide, in so far as compatible with the changed sovereignty . . . the . . . local laws, in force and effect in said Islands on the Seventeenth day of January, Nineteen Hundred and Seventeen, shall remain in force and effect in said Islands, and the same shall be administered . . . through the local judicial tribunals established in said Islands, respectively . . ."

We may assume that the proceedings we are reviewing were in accord with "local laws" as established by Denmark. As the sovereignty of the Islands was changed by treaty from that of Denmark to that of the United States and as Congress provided that thereafter these local laws "in so far as compatible with the changed sovereignty," shall remain and be administered through the local courts, we must inquire whether the defendants were tried according to local laws thus affected by the "changed sovereignty." Just what Congress meant by limiting the operation of Danish local laws to such as are "compatible with the changed sovereignty" is difficult to understand except as we gather its meaning from the kind of sovereignty which the United States, through its laws, constitutional

543

and general, exercises over its possessions.. Its sovereignty is exerted over possessions of three classes: States; territories incorporated into bodies politic; and unincorporated territories. Territory acquired by treaty is regarded as territory appurtenant to the United States, but not as a part of the United States within several meanings, such as, for instance, that of citizenship, the judicial establishment, the revenue clauses of the Constitution, Downes v. Bidwell, 182 U.S. 244, 21 S. Ct. 770, 45 L. Ed. 1088; Dorr v. United States, 195 U.S. 138, 24 S. Ct. 808, 49 L. Ed. 128, 1 Ann. Cas. 697; yet it becomes territory under the complete and absolute dominion of the United States over which civil government in different forms may be established. Its inhabitants, though not incorporated into a body politic, nevertheless owe allegiance to the United States and become entitled to its protection. 14 Diamond Rings v. United States, 183 U.S. 176, 22 S. Ct. 59, 46 L. Ed. 138.

As the treaty of cession between Denmark and the United States did not bring the Virgin Islands into the United States as incorporated territory and as Congress has since the treaty done nothing to incorporate them into the United States, they must be regarded as unincorporated territory, entitled only to the protection of such laws of the United States as are applicable to possessions of that status.

The only laws of the United States applicable to the Virgin Islands are the Act of Congress of March 3, 1917 (supra), and the fundamental law of the Constitution guaranteeing certain rights to all within its protection. These rights have, by repeated decisions of the Supreme Court, been divided into two classes — artificial or remedial rights, which are peculiar to our own system of jurisprudence; and natural or personal rights, enforced in the Constitution by prohibition against interference with them.

Rights of both kinds are embraced within the Fifth and Sixth Amendments to the Constitution. Remedial rights there guaranteed are, for instance, the right of presentment by grand jury and of trial by jury. It has been decided that rights of this character are not among the fundamental rights which Congress in legislating for a territory not incorporated into the United States must secure to its inhabitants. Talton v. Mayes, 163 U.S. 376, 16 S. Ct. 986, 41 L. Ed. 196; Hawaii v. Mankichi, 190 U.S. 197, 23 S. Ct. 787, 47 L. Ed. 1016. In harmony with these decisions it has been further held that until Congress shall extend rights of this character to the inhabitants of newly acquired territory, the judicial system prevailing in such territory — not the system contemplated by the Constitution — is applicable and controlling. But in the Insular Cases — De Lima v. Bidwell, 182 U.S. 1, 21 S. Ct. 743, 45 L. Ed. 1041; Dooley v. United States, 182 U.S. 222, 21 S. Ct. 762, 45 L. Ed. 1074; Downes v. Bidwell, 182 U.S. 244, 21 S. Ct. 770. 45 L. Ed. 1088; as well as in Hawaii v. Mankichi, 190 U.S. 197, 23 S. Ct. 787, 47 L. Ed. 1016, and Dorr v. United States, 195 U.S. 138, 24 S. Ct. 808, 49 L. Ed. 128, 1 Ann. Cas. 697 — where the Supreme Court reviewed nearly the whole range of sovereignty of the United States over its possessions, defining what laws, statutory and constitutional, are not applicable to unincorporated territories until Congress shall extend them, it is made very certain that there are constitutional rights of a natural or personal nature of which Congress can not, in legislating for such outlying territories, deprive their inhabitants. In these cases the Supreme Court clearly expressed the opinion, not on the point of the decisions, to be sure, but as a logical corollary, that even if the people of such territories — not being possessed of the political rights of citizens — are regarded as aliens, they are entitled in the spirit of the Constitution to be protected in

life, liberty and property and not to be deprived thereof without due process of law.

It was, we think, these natural or personal rights, vouchsafed by the Constitution to everyone within its operation, that Congress had in mind when by the Act of March 3, 1917, it provided for retention in the Virgin Islands of local laws and local procedure "in so far as compatible with the changed sovereignty." The Congress evidently intended that a man in the Virgin Islands might be, and, indeed, should be tried for his life under local laws of Danish origin, yet only when those laws are not incompatible with principles brought to the Islands by the change of sovereignty, the cardinal one being that of due process of law.

█ It is well known that the expression "due process of law," though never defined with satisfactory precision, Davidson v. New Orleans, 96 U.S. 97, 24 L. Ed. 616, broadly means law in its regular course of administration, not exclusively but generally, through courts of justice. 3 Story, Const. 264, 661. No fixed procedure is required. Yet its fundamental requirement is an opportunity for a hearing and defense. Ballard v. Hunter, 204 U.S. 241, 27 S. Ct. 261, 51 L. Ed. 461. Due process of law is viewed in the sense in which the English phrase "law of the land" has long been used, namely:

"A law, which hears before it condemns; which proceeds upon inquiry, and renders judgment only after trial." Dartmouth College Case, 4 Wheat. 518, 4 L. Ed. 629.

The Supreme Court in construing the due process clause of the Fourteenth Amendment has spoken within a month as follows:

"The due process clause does not impose upon the States a duty to establish ideal systems for the administration of justice, with every modern improvement and with provision against every possible hardship that may befall. It restrains state action, whether legislative, executive, or judicial, within bounds that are consistent

with the fundamentals of individual liberty and private property, including the right to be heard when liberty or property is at stake in judicial proceedings." James A. Ownbey v. John Pierpont Morgan et al., No. 99, October Term, 1920, April 11, 1921, 256 U.S. 94, 41 S. Ct. 433, 65 L. Ed. 837.

■ The proceedings below, if they had been conducted solely under Danish law, might have conformed to due process of law in that they followed, in due course, legal procedure established under Danish rule. But, while it was declared by The Organic Act that proceedings in the local courts of the Virgin Islands shall be as provided by local Danish laws, Congress wrought a change in those laws by also providing that they remain in force only so far as they are compatible with the changed sovereignty. What the change in sovereignty brought to the Islands was, we think, the right, guaranteed by the new sovereign, of "an accused to be confronted with the witnesses against him" and the right not to be "deprived of life, liberty, or property, without due process of law." The essential element of the latter is the right to be heard.

These are principles which Congress, by the Organic Act, engrafted upon the Danish laws of the Virgin Islands. Without these principles the local laws would not be compatible with the changed sovereignty. Texas & Pacific Ry. Co. v. I.C.C., 162 U.S. 197, 218, 16 S. Ct. 666, 40 L. Ed. 940.

Due, perhaps, to the very real difficulty of administering together two different systems of jurisprudence, it appears that these rights were not extended to the defendants in their trial before the District Court of St. Thomas and St. John, Virgin Islands of the United States. At the trial the defendants were not confronted with the witnesses against them and they were not heard in their defense in that they were not given an opportunity to speak through the cross-examination of witnesses.

Serious as may be the effect of this decision upon the

public mind in the Virgin Islands, we are compelled in the administration of individual justice to reverse the judgment of the court below and order a new trial in harmony with the views expressed in this opinion.