FRANCIS

v.

**PEOPLE OF THE VIRGIN ISLANDS.**

**FRANCIS**

v.

**WILLIAMS, District Judge**

Nos. 3412, 3413▮

Circuit Court of Appeals

Third Circuit

February 26, 1926

*Rehearing Denied April 28, 1926*

*See, also, 11 F.2d 860*

A. A. BERLE, JR., New York City (DAVID WALLERSTEIN, Philadelphia, Pa., of counsel), *for appellant*

CHARLES H. GIBSON, Government Attorney, St. Thomas, Virgin Islands, *for appellees*

Before BUFFINGTON, WOOLLEY, and DAVIS, *Circuit Judges*

WOOLLEY, *Circuit Judge*

These appeals are from judgments of the District Court of the Virgin Islands of the United States for the Sub-Judicial District of St. Thomas and St. John. Clen v. Jorgensen (C.C.A.3d 1920), 1 V.I. 497, 265 Fed. 120; Soto v. United States (C.C.A.3d 1921), 1 V.I. 536, 273 Fed. 628. The first was entered in a proceeding for criminal libel; the second in a proceeding for contempt of court. Although the cases were separately tried and decided and are here on separate appeals, their common origin and the confused conception of the rights and duties of those concerned make it desirable to dispose of them in one opinion.

It would seem, on the surface, the trouble in these cases started in a disturbance which occurred one night in a rough quarter of the town of St. Thomas. The real trouble, we surmise, lies deeper and involves political and racial feelings and aspirations. From a trivial matter (which did not amount even to a street fight) litigation followed by which the parties have raised questions — out of all relation to the matter concerned — affecting the liberty of persons, freedom of the press, jurisdiction of trial and appellate courts, validity of the newly Compiled Code of the Municipality of the Islands of St. Thomas and St. John (1921), and the extent of legislative power granted the Islands by the Government of the United States. Realizing the great size to which slight matters grow in small communities, we have carefully read the whole of these records and have gravely considered all questions presented. Desiring to be of service, if we can, to the people of this colony, we shall, with some pains and at some length and in calm judgment, endeavor to clear up these cases, first by finding and stating their true issues, thereby restoring the cases to their proper propor-

tions, and next by defining in a limited way the rights of the defendant and the duty of the judge in the premises.

## Libel Proceeding

Rothschild Francis is the editor of a newspaper known as "The Emancipator," published at St. Thomas and circulated throughout the Islands. In one of its issues he published an article in these words:

### "A Native Batesko!

"Something is wrong with our Police Force, everybody is saying. Recently a Policeman fired a shot which lodged in the tub of a private citizen. Then he attempted a false arrest and before we were about to go to press, he used his club in a brutal manner on a woman he was ordered to take home, we understand.

"Merchants and other citizens are indignant. How long, oh Justice! How long!"

Philip Mathias, a member of the local police force, conceiving himself the person referred to and feeling aggrieved, complained to the Government Attorney, who filed against Francis an information for criminal libel based on section 36 of chapter 5, Title 4 (IV) of the Compiled Code (1921; 14 V.I.C. § 1171) which provides, so far as it can relate to the instant case, that:

"A libel is a malicious defamation, expressed either by writing, printing, or signs or pictures, . . . tending . . . to impeach the natural or alleged defects of one who is alive . . . and thereby expose him to public hatred, contempt or ridicule."

On being called, Francis asked for trial by jury, which the court refused — and rightly, we think — under section 1 of chapter 12, Title 5 (V) of the Compiled Code (1921; 5 V.I.C. § 3601 note) which gives a defendant the right to demand such a trial only in cases of felony and under section 5 (chapter 1), Title 4 (IV) of the same

Code (1921; 14 V.I.C. § 2), which defines felony as a crime which is punishable by imprisonment for more than one year, and, we may add, under the principles of law by which certain rights guaranteed by Constitution of the United States — among them the right of trial by jury (Const. Amend. 6 [prec. 1 V.I.C.]) — are not extended to the people of territories not incorporated in the United States. Soto v. United States (C.C.A.3d 1921) 1 V.I. 536, 273 Fed. 628, 633. Thereupon the case was tried by the judge who developed issues of magnitude out of the several acts mentioned in the publication. Briefly stated, the testimony showed that Mathias, a policeman, was endeavoring to quiet a disorder, with the result that men ran in different directions and either they or some boys threw stones at him, whereupon he fired his pistol. To obtain a witness to the affair he arrested and later released a bystander and then became involved in an effort to take home an unruly negress whom he struck with his club.

■ ■ The trial judge found the way the writer of the offending publication had reported these occurrences (believing him moved by animus growing out of his opposition to Mathias' appointment to the police force) amounted to malicious defamation and, accordingly, adjudged him guilty and sentenced him to imprisonment for thirty days. In doing so, we find the judge fell into error, and in several respects: First, there always is doubt as to the libelous character of a publication when it becomes necessary to hunt for the libel. That the publication came within the statutory definition of libel was a judgment reached by the judge only after minute analysis and extended discussion. Next, there is a like doubt when it is necessary to search for the person about whom the publication was made. In this instance the article accuses no one by name; nor does it contain anything by which to

identify the person to whom it refers. Though the community is small (population about 10,000) and the police force correspondingly small, there was nothing to show that the public thought the publication was directed to Mathias until he went before the Government Attorney and saying, "I am the person," published the fact himself. Although at the trial counsel admitted that Francis, his client, had Mathias in mind when he wrote the article, still there was no testimony that the public, reading the article, knew, or thought that Mathias was intended. The gravamen of a charge of criminal libel is not the mental act of the person making the publication; it is the effect, in the public estimation, on a person designated by name or by circumstances which identify him. Though news quickly becomes current in small communities, the judge could not take judicial notice of that fact as establishing public knowledge in lieu of proof of the essential fact that the publication pointed to Mathias. Without such proof we are of opinion the conviction was error. Stroud v. Harris (C.C.A. 8th), 5 F.2d 25, 30; Zanker v. Lackey (Del. Super.) 128 A. 373; Odgers, Law of Libel and Slander (5th Ed.) 136.

Aside from this procedural error there is another which, because of the judge's misconception of the purpose of the action running through the trial and elaborately expressed in the opinion, is fundamental. This error is raised by an assignment specifying generally that the defendant was not accorded a fair trial. We shall pass from this assignment to a specific one which charges error to the court in its assumption that the court is an agency for the regulation of the public press. That the trial judge took this position, assumed this power and exercised it is not left in doubt but is asserted by him in justification of his judgment. In proof of the helpful influence on a community of a high-minded and public spirited press

573

issued by trained intelligence and the baneful influence of a mercenary, demagogic and corrupt press put forth by the ignorant, the judge quoted at length from Joseph Pulitzer, "The Windows of Westminster," Sir Thomas More's "Utopia," and Anthony Trollope in "The Warden," and then said, speaking of the press:

"In their superior wisdom and the plentitude of their powers, they presume to direct the activities of the Government and mercilessly to vilify and abuse any public official who happens to cross the path of their interest or whatever course they may be pursuing. This is particularly characteristic of this community, at least respecting a portion of the press. Half-baked opinions and ill-considered thoughts are brought to bear upon partial facts, resulting in a totally misinformed public, many of whom are only too credulous or too willing to believe the worse that may be said about a public official.

"Many newspaper editors (and there are many so-called newspapers) think that under the great panoply of 'freedom of the press' they can find umbrage for their ulterior motives and spurious actions. Liberty of the Press! Oh, Liberty, what crimes are committed in thy name!"

Referring to the passages he had quoted from the writings named, the judge continued:

"Their implication clearly is that great, even irreparable, harm may, and will, come through this powerful instrumentality if in ignorant or corrupt hands, and it is against the trade of such people — in the garb of editors — that the law should ever hold a deterring hand and keep a vigilant eye to prevent the people from being anaesthetized and responding to their diabolical influence. It is the Courts' business to stop this; if not, whose is it? — assuming that the legislative branch of the Government has placed it within their power."

Clearly the trial judge in reaching his judgment did not

confine himself to the defendant's publication criticising police conduct, but availed himself of the publication to exercise a control over the press in the interest, no doubt, of the public good; yet it is equally clear such is not his function. Moreover, it is evident that in arriving at his judgment the judge was not influenced by the offending article alone but by the desire to curb what he regarded, no doubt sincerely, as bad practices of the defendant in his press comments on public officers and public affairs. In all this we are constrained to say the trial judge, no matter how high were his motives, was wrong. The courts of the Virgin Islands are not instrumentalities for the regulation of the public press. Nor is it the function of a judge, when trying a libel action and on being confronted with a question of freedom of the press, to do anything more than decide the matter in hand. He is not concerned with the public morals, nor charged with elevating the standard of the community, nor is he permitted to engage in, or even touch, matters political. His duty is to remain within his own independent and entirely separate department of the government and administer justice between parties before him and there make strong the tribunal to which people may take their disputes, conscious they will be rightly and impartially decided.

We shall postpone comment on the defendant's ideas of freedom of the press until we come to the next case, with the hope that he will not regard this decree in his favor as approval by this court of his conduct, past or present. As the error we have indicated disposes of the case, whether the law under which it was tried was valid or invalid, we are not called upon to decide the validity of certain portions of the Compiled Code (1921) or to inquire into the measure of legislative power granted the adopted colony by the parent government. "It is needless

to enter into many reasons for quashing a conviction when one alone is sufficient." Lord Mansfield, Rex v. Jarvis, 1 Burr. part IV, 152. The judgment is reversed.

## Contempt Proceeding

After Francis had taken an appeal from the judgment in the libel proceeding he caused to be published in "The Emancipator" a long article, in part as follows:

"Trial Per Testes and Its Aftermaths.

"You may not believe the story we are about to relate under ordinary circumstances. However, you are aware that we are responsible for whatever we publish.

"A judge denied a man his day in court, in other words he tried him without a jury and sentenced him to jail.

"According to the charge in the information and in conformity with Anglo-Saxon justice: Triatio ibi semper debet fieri, ubi juratores meliorem possunt habere notitiam (a trial ought always to be had, where the jurors can have the better knowledge), not to mention that the law of the land where the trial was held, entitled the accused to a jury trial. . . .

"Prominent journalists denounced the sentence as erroneous and 'full of spite.'

"Following in their wake came powerful organizations pledging their support to contest to a finish what they consider 'an outrage' — 'a flagrant misrepresentation of justice' and a 'malicious display of power.' . . .

"In the face of these things the judge who sentenced the accused wrote a long letter, containing political inferences, to one of the organizations referred to above, taking exceptions to their interest in the accused's appeal to a higher tribunal.

"The executive committee of this organization of influence, after a careful and impartial study of the judge's letter told its director to reply. And he did so in a scorching manner. He denounced the impudence of the judge —

576

called his attention to his many weak points — and dubbed him as one of the officials who opposed the acknowledged policies of the nation's legislature and its heads of executive departments as outlined for practice wherever they possess territorial jurisdiction. . . .

"Is this judge afraid that his decision will be reversed and remanded through a trial de novo?

"Judges are not supermen. . . .

"Now get the idea. The same judge that railroaded the accused to jail sought to block his chance to further an appeal. Not upon recognized process of law — not from a sense of justice — but from solely racial and political prejudices.

"When the facts in this story are made public, and they have been ordered, those responsible for the appointment of this 'Sir Oracle' in question will have to explain much.

"The old saying, 'Truth should be possessed by a juror, justice and judgment by a judge,' comes afresh to memory, hence we concur with our legal friends that trials per testes in certain instances carry with them dangerous, if not humiliating aftermaths."

Based on the publication of this article, the District Court, pursuant to provisions of the Compiled Code (1921) , instituted against Francis a proceeding for contempt of court and, after hearing, adjudged him guilty and imposed a sentence of imprisonment for thirty days and payment of a fine of $100. Francis moved for an allowance of an appeal. This, by formal order, the judge denied. Francis then moved for the allowance of an appeal from the order denying an appeal. This the judge allowed. So, on first view, it would seem the present appeal is not from the order adjudging Francis guilty of contempt but is from the order denying an appeal from that order.

Yet the record is a transcript of the entire proceeding. Counsel for the appellant, in his brief, states that: "The facts are sufficiently before this court to warrant examination" and (doubtless realizing the waste of time and money, if successful on the narrow issue of right of appeal, in returning to the trial court and taking a new appeal) he and the Government Attorney regarded the hearing on appeal as a trial de novo and argued the validity of the judgment of contempt. We, too, shall consider the whole case here and decide it accordingly.

■ Assuming a right to appeal from the judgment of contempt — a right he clearly had — Francis raised a question of the power of the District Court to prosecute him for contempt, first, by renewing the question of the validity of the Compiled Code (1921), and next, by asserting that under Danish law no such proceeding was recognized and that under the Organic Law (Act of Congress of March 3, 1917, chapter 171, 39 Stat. 1132 [prec. 1 V.I.C.; 48 U.S.C. §§ 1391, 1392, 1394-1396]), no such proceeding is authorized. We dispose of this question in its varied forms by holding that inherent in every court within our government, colonial and national, there is power to enforce and protect the administration of justice within its jurisdiction.

There remains the single question whether the court erred in holding that the publication of the quoted article was in contempt of court.

■ ■ It may be well first to correct a misconception which, as shown by his article, the defendant entertains in respect to freedom of the press and the right of the press to comment on the public doings of public men, granted by federal law. Freedom of the press is distinguished from freedom of speech only in the form of utterance. The rights are the same; neither is higher than the other. Burt v. Advertiser Newspaper Co., 28 N.E. 1,

154 Mass. 238, 13 L.R.A. 97; Sheckell v. Jackson, 10 Cush. (Mass.) 25. Both are named in the same sentence with the same meaning in the First Amendment to the Constitution (prec. 1 V.I.C.). Freedom of speech does not import the right or license to say whatever one pleases, to whom he pleases, and wherever he pleases. This is because the right of free speech is only one of many rights accorded the people and in our scheme of government it is intended that each shall be exercised with regard to the others and that all are to be exercised under restraints imposed by law. Paramount among the other rights is that of the government to maintain its organization and, through its organization, the right to function and exist. The right of free speech, of course, does not carry with it the right to injure the government that gave it. In entire harmony with this law is the "ancient and undoubted prerogative of this country to canvass public measures and the merits of public men." The public acts of public men may lawfully be made the subject of fair comment and criticism, by the press and by all members of the public, but the law distinguishes between fair comment and criticism and false allegations of fact and of disgraceful acts. In the enforcement of this distinction, freedom of the press is not in danger. Davis v. Shepstone, 11 App. Cas. L. R. 187; Post Publishing Co. v. Hallam (C.C.A. 6th) 59 Fed. 530, 8 C.C.A. 201; Donahoe v. Star Publishing Co., 55 A. 337, 4 Pennewill (Del.) 166, 183, 184.

 Coming to the courts, the law also distinguishes between attacks on the judge and on the tribunal itself. The former may be libelous and, when so, the remedy is by civil action; the latter is contempt according to its purpose and effect, and, when so, the offender is open to punishment. In our jurisprudence the extraordinary action of contempt of court does not lie to heal the wounded sensibilities of a judge; it may be invoked only when the

offending act impedes or disturbs the administration of justice. A publication aimed to prejudice a court in public estimation, calculated and intended to destroy its function as a department of the government, and which has the effect of embarrassing the administration of justice is neither a privilege nor a right accorded by law.

 The publication in question identified the judge and the court to which it was directed. The writer assailed the court for a conceived injustice in subjecting him to trial in a criminal action without a jury. If that was error, the law provides means for its correction. Of this the defendant availed himself by appeal to this court where he might reasonably have expected to find redress, as shown by the judgment just rendered in his favor, though on a ground other than the one of which he publicly complained. Pending the determination of his appeal, the judgment of the District Court was law, and by that law he was bound until it was changed by orderly process. Instead of awaiting the decision on the appeal he attacked the court by the publication in question. It was more than a personal attack on the judge. The writer declaimed on his trial and conviction otherwise than by jury (as to which, as we have seen, he was wrong) and through the judgment he assailed the court that rendered it. No one who has read the article, and believing its accusations, can ever have confidence in the judgments of the court as presently constituted. On the principle that everyone is presumed to intend the natural and probable consequences of his acts, it is plain that the defendant intended to prejudice, and did prejudice, the court in the public mind and particularly in the mind of the race constituting the major part of the local population. For this hurt to the administration of justice the defendant is answerable.

The judgment below is affirmed.