**UNITED STATES ex rel. LEGUILLOU**

v.

**MORRELL DAVIS**

Civ. No. 58

District Court of the Virgin Islands

Div. of St. Croix at Christiansted

October 16, 1953

*See, also, 115 F. Supp. 392*

*Same case on appeal, see 3 V.I.*

WARREN H. YOUNG, Christiansted, Virgin Islands, *for relator*

CYRIL MICHAEL, Dist. Atty., and CROXTON WILLIAMS, Asst. Dist. Atty., CHARLOTTE AMALIE, Virgin Islands, *for respondent*

MARIS, *Circuit Judge*

An application for a writ of habeas corpus has been made to me as a circuit judge of the Third Circuit by the relator, Tomas Leguillou, a prisoner confined in the Richmond Penitentiary in St. Croix, Virgin Islands, under a sentence of 14 years at hard labor imposed by the District

Court of the Virgin Islands upon his conviction by that court of murder in the second degree. The relator, who is a native of Puerto Rico, asserts that his conviction was invalid because he was deprived thereby of his liberty without due process of law and was denied the equal protection of the laws in violation of the Constitution of the United States and the Organic Act of the Virgin Islands. He seeks to have his conviction declared void and to be discharged from custody thereunder. Upon consideration of the application I entered an order directing the respondent, Morrell Davis, Director of the Police and Prison Department of the Municipality of St. Croix, in whose custody the relator is, to show cause why the writ should not be granted. The respondent filed a return, the relator filed a traverse, a hearing was held by me in Christiansted, briefs have now been filed by both parties and the application is before me for final determination.

Section 2241 of Title 28, United States Code, confers upon me as a circuit judge for the Third Circuit the power to grant a writ of habeas corpus within the Third Circuit upon the application of a prisoner who is in custody in violation of the Constitution or laws of the United States. The Virgin Islands are within the Third Circuit[1] and the relator asserts that he is in custody in violation of the Constitution and the Organic Act (1936) of the Virgin Islands, a law of the United States.[2] I accordingly have jurisdiction of the application unless I am deprived of it by section 2254 or section 2255 of Title 28, United States Code. The respondent asserts that these sections do deprive me of jurisdiction and he moved at the hearing to dismiss the application for this reason. I, therefore, must at the outset consider the effect of these sections.

[1] 28 U.S.C. § 41.
[2] Act of June 22, 1936, ch. 699, 49 Stat. 1807 (prec. 1 V.I.C.); 48 U.S.C. §§ 1405-1406m.

■ - ■ Section 2254 embodies the rule that ordinarily an applicant who is in custody pursuant to the judgment of a state court must show that he has exhausted his available state remedies before a federal court may grant a writ of habeas corpus. It is perfectly clear that this section can have no application here. For the reference in section 2254 is to the states of the union which have sovereignty independent of the federal government, the purpose of the section being to protect the administration by those sovereign states of their criminal law through their own courts from undue interference by the federal courts.[3] The Virgin Islands, however, are not a state in the sense of having sovereignty or a system of law and courts which are independent of the federal government. On the contrary they are an unincorporated territory of the United States not destined for statehood.[4] The local law of the Virgin Islands derives its authority solely from an Act of Congress, sections 18 and 19 of the Organic Act (act June 22, 1936, ch. 699, §§ 18, 19, 49 Stat. 1811; prec. 1 V.I.C.)[5] and the District Court of the Virgin Islands, the court in which is vested the judicial power of the territory as well as the federal jurisdiction there, was created by the same Act of Congress (act June 22, 1936, ch. 699, § 25, 49 Stat. 1813; prec. 1 V.I.C.)[6]. The district court is empowered to issue writs of habeas corpus both under the local[7] and the federal law[8] and a circuit judge when granting the writ in the Virgin Islands does so in the district court.[9] All ap-

[3] Mooney v. Holohan (1935) 294 U.S. 103, 55 S. Ct. 340, 79 L. Ed. 791; Ex parte Hawk (1944) 321 U.S. 114, 116-117, 64 S. Ct. 448, 88 L. Ed. 572; Darr v. Burford (1950) 339 U.S. 200, 70 S. Ct. 587, 94 L. Ed. 761.
[4] Soto v. United States, 3 Cir. (1921), 273 Fed. 628; Alton v. Alton, 3 Cir. (1953), 207 F.2d 667.
[5] 48 U.S.C. §§ 1405q, 1405r.
[6] 48 U.S.C. § 1405x.
[7] Code of Laws of the Municipality of St. Croix, Title III, ch. 54; Code of Laws of the Municipality of St. Thomas and St. John, Title III, ch. 54 (1921; 5 V.I.C. § 1301 et seq.).
[8] 48 U.S.C. § 1406; 28 U.S.C. § 1651.
[9] 28 U.S.C. § 2241(a).

peals from that court go to the United States Court of Appeals for the Third Circuit, its jurisdiction to consider them having been conferred by Congress under the territorial power.[10] It will thus be seen that the territorial judiciary in the Virgin Islands is wholly federal in its origin and in the source of its powers. The distinction between territorial and federal remedies in the Virgin Islands so far as the writ of habeas corpus is concerned is, therefore, of no practical significance since the same courts and judges administer both.[11]

Section 2255 of Title 28 provides that a prisoner confined under sentence of a court created by Act of Congress who claims the right to be released upon the ground, inter alia, that the sentence was imposed in violation of the Constitution or laws of the United States may move the court which imposed the sentence to vacate it or set it aside. The section further provides that if he fails to do so an application on his behalf for a writ of habeas corpus may not be entertained "unless it also appears that the remedy by motion is inadequate or ineffective to test the legality of his detention." The District Court of the Virgin Islands is, as we have seen, a court created by Act of Congress. Section 2255, therefore, applies to it. The relator has made no motion in that court under section 2255. Nonetheless I am satisfied that the section, properly construed and applied, does not deprive me of power to entertain his present application for habeas corpus.

██ In the first place the purpose of enacting section 2255 was to provide that the right of a prisoner convicted in a court created by Act of Congress to attack his conviction on constitutional grounds should be asserted before the court which sentenced him and not before some other

---

[10] 28 U.S.C. § 1294(4). See Ex parte Moran, 8 Cir. (1906), 144 Fed. 594, 598, affirmed 203 U.S. 96, 27 S. Ct. 25, 51 L. Ed. 105.
[11] Benner v. Porter (1850) 9 How. 235, 50 U.S. 235, 242, 13 L. Ed. 119.

court. The basic idea, as pointed out by Chief Judge Parker, the chairman of the committee which drafted the language embodied in the section, was to require "that the attack upon the judgment of imprisonment be made in the court where it was rendered, where the facts with regard to the procedure followed are known to the court officials, and where the United States Attorney who prosecuted the case will be at hand to see that these facts are fairly presented."[12] In considering the present application I do so for all practical purposes as a judge of the District Court of the Virgin Islands. For my proceedings and order are required by law to be entered in the records of that court.[13] I heard the application in the Virgin Islands, and from the order which I will enter in the district court an appeal may be taken to the United States Court of Appeals for the Third Circuit in the same manner as if the order had been entered by the regularly appointed judge of the district court.[14] The application before me is, therefore, for all practical purposes an application by the relator to the sentencing court as section 2255 requires. The fact that the application is for a writ of habeas corpus rather than for an order vacating or setting aside the sentence is a procedural distinction which is without significance in these circumstances since any relief to which the relator is entitled may be accorded him in either form.

Moreover I think that the remedy by motion to the district court would probably be ineffective to test the legality of the realtor's detention. For the district court has only one regularly appointed judge to whom the motion could be made. And while Judge Moore would not be disqualified to pass upon the relator's contentions with respect to the

[12]Parker, Limiting the Abuse of Habeas Corpus (1949) 8 F.R.D. 171, 175. See also United States v. Hayman (1952) 342 U.S. 205, 72 S. Ct. 263, 96 L. Ed. 232.
[13]28 U.S.C. § 2241(a).
[14]28 U.S.C. § 2253.

trial over which he presided he might well regard himself as disqualified to pass upon the contentions with respect to the selection of the jury panel prior to the trial in which he was required to take a leading administrative role. For this very reason it is appropriate for me to entertain the application rather than to transfer it to the judge of the district court, as section 2241 (b) of Title 28 would permit me to do in my discretion.

 I pass then to the merits of the relator's application. Since habeas corpus may not be used as a substitute for an appeal[15] I need consider only those of his contentions which allege errors so basic as to amount to a denial of constitutional rights.[16] While the Virgin Islands are not an incorporated territory of the United States the fundamental guarantee of the Fifth Amendment to the Constitution of the United States (prec. 1 V.I.C.) that no person shall be deprived of life, liberty or property without due process of law nonetheless applies in full force in the islands.[17] And at least as applied to a territory the due process clause of the Fifth Amendment implies equal protection of the laws.[18] Moreover the Fifth Amendment has been supplemented in the Virgin Islands by section 34 of the Organic Act (Act June 22, 1936, ch. 699 § 34, 49 Stat. 1815; prec. 1 V.I.C.) which provides a bill of rights including full guarantees of due process of law and equal protection of the laws.[19] The relator's contentions are that he was denied due process of law and

[15]Eagles v. United States ex rel. Samuels (1946) 329 U.S. 304, 67 S. Ct. 313, 91 L. Ed. 308.

[16]United States ex rel. Innes v. Hiatt, 3 Cir. (1944), 141 F.2d 664.

[17]Soto v. United States, 3 Cir. (1921), 273 Fed. 628; Thornberg v. Jorgensen, 3 Cir. (1932), 60 F.2d 471; Alton v. Alton, 3 Cir. (1953), 207 F.2d 667.

[18]Lappin v. District of Columbia (1903) 22 App. D.C. 68; Sims v. Rives (1936) 66 App. D.C. 24, 84 F. 2d 871, certiorari denied 298 U.S. 682, 56 S. Ct. 960, 80 L. Ed. 1402; Hamilton Nat. Bank v. District of Columbia (1949) 85 U.S. App. D.C. 109, 176 F.2d 624, 630, certiorari denied 338 U.S. 891, 70 S. Ct. 241, 94 L. Ed. 547.

[19]48 U.S.C. § 1406g.

equal protection of the laws in that the jury was not selected in accordance with the local law, in that persons of Puerto Rican descent were excluded therefrom, in that the trial was conducted for a period of time beyond the limits of human endurance and in that the district attorney unduly prejudiced the minds of the jury against him. These contentions I shall consider in the order mentioned.

The relator contends that his constitutional rights were violated by the manner in which the jury which convicted him was selected. This contention has two bases, that he was denied due process by the failure of the officials concerned to select the jury in accordance with the requirements of the St. Croix Code and that he was denied equal protection of the laws through the systematic exclusion of persons of Puerto Rican descent from jury service.

The St. Croix Code provides for a jury commission for the municipality consisting of a commissioner appointed by the municipal council, a commissioner appointed by the Governor and the deputy clerk of the district court.[20] Biennially the electoral board for each electoral district of the municipality is required to furnish the clerk of the district court with the newly completed lists of voters and within 10 days after receiving the lists it is "the duty of the Jury Commission to meet for the purpose of adding thereto the names of all persons within the Municipality who are known to be competent as jurors." The complete list of known jurors thus prepared is then to be presented to the district court.[21] Within 10 days before each term of court it is the duty of the judge of the district court in the presence of at least two members of the jury commission to select with reference to their intelligence, sobriety and integrity and without the least reference to their political

[20]Code of Laws of the Municipality of St. Croix (1921), Title V, ch. 12, sec. 4 (4 V.I.C. § 474).
[21]Ibid. sec. 5, as amended by Ordinance approved February 6, 1940 (4 V.I.C. § 476).

opinions, from the list thus prepared the names of 75 persons who shall constitute the general panel.[22] The names of the persons thus comprising the general panel are then to be written on separate ballots which are to be placed by the judge in a box from which the deputy clerk of the district court is to draw one by one such number of ballots as the judge may direct, not exceeding 24.[23] which names shall constitute the jury panel for the ensuing term of court.[24] The names of the jury panel thus formed are to be placed in the trial jury box[25] from which the trial jury in each individual case is to be drawn.[26]

The relator contends, and the evidence supports his contention, that these requirements of the local law have not been strictly observed in the past and were departed from in certain particulars in the selection of the jury panel from which the trial jury in his case was, in part, drawn. Thus it appears that the jury commission in St. Croix have never met for the purpose of adding to the list of voters the names of other citizens known to be competent jurors. In other words the general panel has always comprised merely the list of voters. Under section 2, chapter 12, Title V, of the St. Croix Code (1921; 4 V.I.C. § 471), however, all citizens of the United States over 25 years of age, in possession of their natural faculties and of sound mind, who have resided in the municipality for six months and have not been convicted of a felony, are eligible to act as jurors even though they have not been registered as voters. The failure of the jury commission to add the names of qualified nonvoting persons, the relator says, has denied him equal protection of the laws because the American citizens of Puerto

[22]Ibid. sec. 6 (4 V.I.C. § 476).
[23]By amendment of January 29, 1953, the maximum number of names to be drawn for the Jury Panel was increased to 48.
[24]Code of Laws of the Municipality of St. Croix (1921), Title V, ch. 12, sec. 7 (4 V.I.C. §§ 473, 475, 476, 478, 479).
[25]Ibid. sec. 9 (5 V.I.C. § 322).
[26]Ibid. ch. 13, sec. 2 (4 V.I.C. § 480).

Rican descent, of which group he is a member and against whom prejudice exists in St. Croix, constitute a large minority in the population of the island but do not appear in any number on the voters' lists since few of them register for voting. There are, however, asserts the relator, substantial numbers of unregistered citizens of Puerto Rican descent in St. Croix who are qualified for jury service and whose names would have been added if the jury commission had performed their duty in this respect. It further appears that the general panel for the term in which the relator was tried, was not prepared by the judge from the voters' list as required. On the contrary the deputy clerk of the district court prepared what was called a master list by eliminating from the list of voters the names of persons deemed by him unsuitable for jury service and the jury commission, in the absence of the judge, prepared the general panel of 75 names from this master list, the judge subsequently giving his general approval to what had been done in his absence.

██ ██ I do not regard these departures from the procedure laid down by the St. Croix Code as available to the relator on this application for habeas corpus. The preparation of the general panel by the jury commission rather than by the judge of the district court and the action of the deputy clerk, not authorized by the Code, in preparing from the list of voters a master list from which the general panel was drawn were merely procedural irregularities from which the relator has shown no prejudice to himself.[27] And in view of section 3, Chapter 13, Title V, of the St. Croix Code (1921; 5 V.I.C. §§ 323, 3603), which provides that "No challenge shall be made or allowed to the panel", it would appear that objections to these

[27]Ex parte Harding (1887) 120 U.S. 782, 7 S. Ct. 780, 30 L. Ed. 824; Matter of Moran (1906) 203 U.S. 96, 27 S. Ct. 25, 51 L. Ed. 105; Connella v. Haskell, 8 Cir. (1907), 158 Fed. 285.

matters could not be raised by the relator at any time, unless upon a showing of substantial prejudice to himself. It has been so held by the United States Court of Appeals for the Ninth Circuit in construing section 2230 of the Compiled Laws of Alaska, 1913, from which section 3, chapter 13, Title V, of the St. Croix Code (1921; 5 V.I.C. §§ 323, 3603) was drawn.[28] And the Supreme Court of Oregon has upheld the Oregon statute upon which in turn the Alaska law was based.[29] The failure of the jury commission to perform its duty of adding the names of those citizens who were qualified for jury service but not registered as voters, while undoubtedly an error on their part, is likewise not available to the relator on habeas corpus. For the only prejudice suggested by the relator is the absence from the general and trial panels of persons of Puerto Rican descent who might in that way have been added thereto. But the evidence is uncontradicted and I find it to be the fact that the failure of the jury commission to add qualified but unregistered citizens to the list from which the general panel was drawn was solely due to their lack of knowledge that it was their duty to do so and not from any design on their part to exclude persons of Puerto Rican descent from jury service.[30]

[28]Hauptmann v. United States, 9 Cir. (1930), 43 F.2d 86, 90, certiorari denied 282 U.S. 900, 51 S. Ct. 212, 75 L. Ed. 793.

[29]State v. Savage (1900) 36 Or. 191, 60 Pac. 610, 61 Pac. 1128; State v. Ju Nun (1908) 53 Or. 1, 97 Pac. 96, 98 Pac. 513.

[30]It is the duty of the jury commission under sec. 5, ch. 12, Title V, of the St. Croix Code (1921; 4 V.I.C. § 476) to take active steps to investigate and find out who among the unregistered citizens residing in St. Croix are qualified for jury service and to add them to the list. They cannot rest upon the fact that they do not personally know any such citizens, or that the unregistered citizens whom they do know personally are not qualified. Smith v. Texas (1940) 311 U.S. 128, 131-132, 61 S. Ct. 164, 85 L. Ed. 84; Hill v. Texas (1942) 316 U.S. 400, 402, 404, 62 S. Ct. 1159, 86 L. Ed. 1559; Cassell v. Texas (1950) 339 U.S. 282, 70 S. Ct. 629, 94 L. Ed. 839. In the Cassell case the Supreme Court said 339 U.S. at page 289, 70 S. Ct. at page 633:

"When the commissioners were appointed as judicial administrative officials, it was their duty to familiarize themselves fairly with the qualifications of the eligible jurors of the county without regard to race and color."

I pass then to the relator's contention that he was denied the equal protection of the laws through the systematic exclusion of such persons from jury service. There was evidence and I find it to be a fact that in 1950 there were residing in St. Croix 3,407 natives of Puerto Rico and their descendants out of a total population of 12,103. These persons of Puerto Rican descent thus constituted 28% of the population of the island. It also unfortunately appears to be the fact that a certain amount of prejudice exists in St. Croix against the Puerto Rican minority group. If, therefore, qualified persons of Puerto Rican descent were in fact intentionally and systematically excluded from jury service at the time of the relator's trial, he, as a member of the Puerto Rican group, was undoubtedly denied the equal protection of the laws.[31] The following language of Justice Murphy, speaking for the Supreme Court in Thiel v. Southern Pacific Co., 1946, 328 U.S. 217, 220, 66 S. Ct. 984, 985, 90 L. Ed. 1181, is pertinent in this connection:

"The American tradition of trial by jury, considered in connection with either criminal or civil proceedings, necessarily contemplates an impartial jury drawn from a cross-section of the community. Smith v. Texas, 311 U.S. 128, 130, 61 S. Ct. 164, 165, 85 L. Ed. 84; Glasser v. United States, 315 U.S. 60, 85, 62 S. Ct. 457, 471, 86 L. Ed. 680. This does not mean, of course, that every jury must contain representatives of all the economic, social, religious, racial, political and geographical groups of the community; frequently such complete representation would be impossible. But it does mean that prospective jurors shall be selected by court officials without systematic and intentional exclusion of any of these groups. Recognition must be given to the fact that those eligible for jury service are to be found in every stratum of society. Jury competence is an individual rather than a group or class matter. That fact lies at the very heart of the

[31]Carter v. Texas (1900) 177 U.S. 442, 20 S. Ct. 687, 44 L. Ed. 839; Pierre v. Louisiana (1939) 306 U.S. 354, 59 S. Ct. 536, 83 L. Ed. 757; Smith v. Texas (1940) 311 U.S. 128, 61 S. Ct. 164, 85 L. Ed. 84; Hill v. Texas (1942) 316 U.S. 400, 62 S. Ct. 1159, 86 L. Ed. 1559.

jury system. To disregard it is to open the door to class distinctions and discriminations which are abhorrent to the democratic ideals of trial by jury."

So far as concerns the general panel and the jury panel from which the trial jury was, in part, selected I do not find that there was an intentional or systematic exclusion of persons of Puerto Rican descent. It is true that none of this group was selected for the term of court at which the relator was tried and that the names of no more than four persons of Puerto Rican descent appeared on any general panel during the preceding five years. But this may well have been due to the comparatively small number of such persons who registered to vote,[32] to the fact that many of those who did register to vote did not have a sufficiently thorough knowledge of the English language to qualify as jurors, and to the fact that the jury commission failed, as we have seen, to add to the list the names of nonregistered citizens of Puerto Rican descent who were qualified for jury service.

 Only five members of the trial jury in the relator's case were obtained from the jury panel previously prepared for the term of court. To complete the jury it became necessary for the trial judge to issue successively two open venires as authorized by section 2, chapter 13, Title V, of the St. Croix Code (1921; 4 V.I.C. § 480), the first for 19 prospective jurymen and the second for five. These were directed to the marshal and were excuted by him. From the 24 persons thus summoned the remaining seven members of the trial jury were selected. It appears that in the

[32]In 1948 only 53 persons of Puerto Rican descent registered to vote in St. Croix out of a total registration of 1,038. The small number was doubtless influenced to some extent by the fact that a great many Puerto Ricans in St. Croix are not sufficiently familiar with the English language to qualify as voters under section 17 of the Organic Act (Act June 22, 1936, ch. 699, § 17, 49 Stat. 1811; prec 1 V.I.C.; 48 U.S.C. § 1405p). For the same reason they would not qualify as jurors, since the proceedings of the district court are conducted in English.

selection by the marshal and his deputies of the persons thus summoned for jury service on the open venires persons of Puerto Rican descent were intentionally, systematically and completely excluded. The marshal so testified and I find it to be the fact. The marshal frankly stated that he summoned no Puerto Ricans because he took for granted that they would be interested either in the defendant or the deceased, since both were Puerto Ricans, and, therefore, would be disqualified, and so he excluded them all in order to expedite the trial "because we go all night in court and it is up to me to get in people that are going to qualify and push the trial ahead." The motives which thus actuated the marshal were entirely laudable. However, in taking upon himself the responsibility for passing upon the bias of prospective jurors he was acting in an area reserved by law for the trial judge. And in excluding all persons of Puerto Rican descent and thereby preventing consideration by the court of the individual qualifications of such persons for jury service he deprived the defendant of the equal protection of the laws with respect to the selection of seven-twelfths of the jury which tried him. The denial of such a basic constitutional right must be assumed to have been prejudicial to the relator.[33] Since the St. Croix Code (1921) prohibited a challenge to the panel it would appear that this point could not have been raised at the trial. It cannot, therefore, be regarded as having been waived by the relator and may be raised on habeas corpus.[34] I accordingly conclude that in the selection of the trial jury the relator was denied his right under the Fifth Amendment and the Virgin Islands bill of rights to the equal protection of the laws.

[33]United States v. Kobli, 3 Cir. (1949), 172 F.2d 919, 921.
[34]Frank v. Mangum, 1915, 237 U.S. 309, 35 S. Ct. 582, 59 L. Ed. 969; Johnson v. Zerbst (1938) 304 U.S. 458, 58 S. Ct. 1019, 82 L. Ed. 1461. Compare Sunal v. Large (1947) 332 U.S. 174, 67 S. Ct. 1588, 91 L. Ed. 1982; Dowd v. U. S. ex rel. Cook (1951) 340 U.S. 206, 71 S. Ct. 262, 95 L. Ed. 215.

315

The relator's next contention is that the conduct of the trial continuously for a period of time beyond the limits of human endurance amounted to a denial of due process of law. The facts are that the case was called for trial at 10 a.m. on June 15, 1949 and the trial jury was chosen and impaneled. The trial then proceeded until 1 p.m. when a recess for luncheon was taken until 2:30 p.m. The court then reconvened and after a visit by the jury to the scene of the alleged crime continued in session until 6:25 p.m. A recess for supper was taken at that time and the court reconvened at 8:15 p.m. The taking of testimony was then resumed and concluded and was followed immediately by the arguments of counsel and the charge of the trial judge to the jury. The charge was concluded at 1:55 a.m. on June 16, 1949 and the jury thereupon retired to the jury room to deliberate upon their verdict. The jury remained in the jury room until 6:20 a.m. when they returned to the court room and rendered their verdict. The court was thus in continuous session, except for two recesses for meals, for a period of 16 hours and the jury were required thereafter to remain together in deliberation upon their verdict for four and one-half hours longer, a total period of more than 20 hours during which they were, except at meal times, required to give continuous attention to the relator's case.

The St. Croix Code (1921) quite properly requires that when a case is finally submitted after the charge of the court "the jurors must be kept together in some convenient place under the charge of an officer until they agree upon a verdict or are discharged by the court". The Code, however, contemplates that prior to final submission the jurors, in the discretion of the court, may be permitted to separate since it provides that "if the jurors be permitted to separate during the trial, they shall be admonished by the court that it is their duty not to converse with, nor to

suffer themselves to be addressed by anyone, nor to form or express an opinion thereon, until the case is finally submitted to them."[35] The district court thus is empowered prior to final submission to permit the jurors to separate to go to their homes to sleep when it appears that the trial unless adjourned is likely to run far into the night. If the court thinks that such separation may prejudice the parties by placing the jurors in undue danger of being improperly influenced it may make such arrangements as are practicable for lodging the jurors for the night at a hotel or other suitable place under the charge of officers of the court. Either of these courses might have been followed in this case at the close of the testimony, leaving the arguments of counsel, the charge of the court and the deliberations of the jury to take place the next day after the jurors had been refreshed by a night's sleep.

■■ ■■ As the trial was actually conducted, however, the case went to the jury at 2 a.m., after a long day and evening of testimony, argument and charge, and the jurors were required to deliberate and decide upon the defendant's guilt during the remainder of the night. I find from the testimony before me that the jurors were tired and sleepy during their deliberations and that some of them were so fatigued as to be unable to enter into the discussion of the issues and simply wanted to get the case decided, without too much caring how, so that they could go home and get some sleep. Indeed one of the jurors had been up all of the preceding night as well. In considering this issue it must be remembered that the relator was subject

[35]Code of Laws of the Municipality of St. Croix (1921), Title V, ch. 14, sec. 2 (5 V.I.C. § 3632).

In courts created by Act of Congress separation of the jurors during the trial may be permitted, in the discretion of the trial judge, even in a capital case. Holt v. United States (1910) 218 U.S. 245, 31 S. Ct. 2, 54 L. Ed. 1021; McHenry v. United States (1921) 51 App. D.C. 119, 276 Fed. 761, 34 A.L.R. 1109.

to possible capital punishment for the crime of murder for which he was on trial. His life was placed in the hands of these fatigued and sleepy jurors attempting to deliberate when they were all yearning for rest and sleep. It is obvious that under these circumstances there was an element of coercion in the jury room resulting from physical and mental exhaustion which made it impossible for the jury to give that careful, intelligent and fair consideration of the evidence in the case to which the relator, on trial for his life, was entitled.[36] Due process of law implies the presence of a tribunal not only impartial but also mentally competent to afford a hearing.[37] Under the mandate of the due process clause a person cannot be judicially deprived of his life, liberty or property except by a tribunal which is able to give its attention to his case, to consider it fully and to decide it solely upon its merits under the law. I am satisfied that the jury which convicted the relator was not able due to the limitations of human strength and endurance, to give that kind of consideration to this case.

 ▪ We have travelled a long way from the ancient days when English juries were literally coerced into giving their verdicts by being kept together, until they did so, "without meat or drinke, fire or candle,"[38] as prisoners of the court, being carried round the circuit from court town to court town in a cart.[39] Today no element of coercion may be permitted to play any part in the verdict of a jury. Thus the trial judge may not threaten to keep the jury together some length of time in order to induce a

[36]Compare United States v. Pleva, 2 Cir. (1933), 66 F.2d 529; Keeshin Motor Express Co. v. Glassman (1942) 219 Ind. 538, 38 N.E.2d 847, 855.
[37]Jordan v. Com. of Massachusetts (1912) 225 U.S. 167, 176, 32 S. Ct. 651, 56 L. Ed. 1038.
[38]2 Coke upon Littleton 227.b.
[39]3 Blackstone's Commentaries, Lewis's Ed., 376.

318.

verdict.[40] By the same token coercion resulting from sheer physical and mental exhaustion should have no part in inducing a jury to reach a quick verdict, no matter how. The evidence indicates that it has been customary in St. Croix for the district court to conduct jury trials continuously, without permitting jurors to sleep during the night, from the empaneling of the jury until the rendering of the verdict. A continuous session may well be appropriate in short trials when the case can be submitted to the jury in the early evening. And there may perhaps be cases under the peculiar circumstance of which a jury may properly be required to deliberate all night. But I cannot escape the conclusion that it was beyond the bounds of judicial discretion in the relator's capital case to require the jury to give their attention to the case without recesses other than for meals continuously for a full day and night. I conclude that the relator was thereby denied due process of law in violation of the Fifth Amendment and the bill of rights of the Virgin Islands.

 Finally the relator contends that the district attorney unduly prejudiced the jury against him. He refers to three instances, the first when the district attorney sought to introduce as an exhibit the stabbed heart of the deceased, the second when he asked a defendant's witness whether the defendant had used him for the purpose of setting fire to a warehouse and the third when he attempted to confuse the defendant with the contents of a statement he had signed. in each instance the trial judge sustained the defendant's objections. It may be conceded that these tactics of the district attorney were improper, as the trial judge held. But I cannot say that they were so grossly unfair as to amount to a denial of due process

[40]Kesley v. United States, 5 Cir. (1931), 47 F.2d 453, 85 A.L.R. 1418, and note; Boyett v. United States, 5 Cir. (1931), 48 F.2d 482, 484.

of law which is available to the relator on this application for habeas corpus.

Because of the denial of equal protection of the laws and of due process of law to which I have referred the judgment of conviction and sentence of the relator was invalid and must be held for naught. This does not mean, however, that the relator may escape further punishment under the information. For while his conviction and sentence under the information must be held void and he must be released from further service of the sentence, he will be subject to rearrest and trial under the information.[41] The defense of double jeopardy will not protect him from such a trial for it is settled that an accused is not put in jeopardy by a void judgment of conviction and that upon his discharge thereunder he may be rearrested and prosecuted.[42]

The respondent's motions to dismiss the relator's application for a writ of habeas corpus are denied. An order will be entered directing the respondent to release the relator from confinement under the judgment and sentence of the district court entered June 16, 1949 but authorizing him to continue to hold him in custody to answer the charge of murder contained in the information filed against him on April 1, 1949. If he is convicted of that charge the sentencing judge will undoubtedly take into consideration the fact that the relator has served more than four years in the penitentiary under the judgment and sentence which I have held to be a nullity.

[41]Hill v. Texas (1942) 316 U.S. 400, 406, 62 S. Ct. 1159, 86 L. Ed. 1559; Dowd v. U. S. ex rel. Cook (1951) 340 U.S. 206, 210, 71 S. Ct. 262, 95 L. Ed. 215.

[42]Bryant v. United States, 8 Cir. (1914), 214 Fed. 51; Mitchell v. Youell, 4 Cir. (1942), 130 F.2d 880; United States v. Lowrey, D.C., 77 F. Supp. 301, affirmed, 3 Cir. (1949), 172 F.2d 226.