In the Matter of the Petition of

EVELYN RICHARDSON, MARIE MOORHEAD, JANE JOSEPH
and Others, Plaintiffs

v.

ELECTORAL BOARDS FOR THE TOWN AND SUBURBS OF
FREDERIKSTED, AND MEMBERS, MESSRS. WALTER J.
MAGUIRE, FREDERICK DORSCH, MALCOLM SKEOCH,
ARNOLD M. GOLDEN, and Chairman D. HAMILTON
JACKSON, Defendants

April Term, 1936

No. 119

District Court of the Virgin Islands

Frederiksted Sub-Judicial District
St. Croix

April 15, 1936

LEVITT, *Judge*

The plaintiffs in this case are the following:

| | |
|---|---|
| Evelyn Richardson | Helena Bates |
| Helen Williams | Nellie Benjamin |
| Elizabeth Barry | Regina Nieves |
| Sedorah Thomas | Elvina A. Thomas |
| Mrs. Fritz Morris | Adella Coppin |
| Rosalin Dowling | Maud McFarlane |
| Arabella Bjeelke | Anna Edwards |
| Adele Berg | Juliana Barry |
| Octavia Bolling | Sophia Henderson |
| Evadney Doute | Susanna A. Joseph |
| Francesa Rodriguez | Christiana Sackey |
| Isabella Tuitt | Anna Williams |
| Eliza Lawrence | Maria Jacobs |
| Mrs. Josephine Jackson | Mary Henry |
| Alexandra M. Granjean | Rosamond Lewis |

Georgiana James
Julia Vecht
Mary Cornelius
Eugenie Relarme
Ellenora Heyliger
Gregoria Aresmende Soto
Martina Johnson
Virginia Tranberg
Ingeborg Samuel
Marie Moorhead
Anna B. Ferris
Agatha James
Malvina Smith
Maria Chico
Mathilda Fawcett
Valentina Ovesen
Blanche Estornel
Alice Nesbitt
Aileen Clarke
Ethel F. Maguire
Julia Ratcliffe
Bergarda Terres
Virginia Bjergrav
Eulalie Jackson
Catherine Carr
Ann Kerr
Catherine Hodge
Jane A. Reilly
Ancilla Springer
Evelyn Golden
Eulalie C. Rivera
Phoebe Hewitt
Hilda Ford
Anita Eilets
Ann Samuel

Annabelle Joseph
Ann E. Samuel
Margaret Lehmann
Catherine Marcus
Antionette Douglas
Mary Parris
Wilhelmena Taylor
Catherine Palidore
Roselia Williams
Ann Reyliger
Lucia Burgois Robles
Louisa Edwards
Jane Joseph
Mary Farrelly
Estella Franklin
Edith Ratcliffe
Wilhelmena Williams
Ann E. McIntosh
Sr. Edith Prince
Ingeborg Nesbitt
Ilva A. Gardine
Odelia Jackson
Georgiana Lee
Irene B. Dorsch
Petrina Thomas
Miriam Sarauw
Hilda Mullgrav
Maria McBean
Felecia McCabe
Margaret Alliek
Mary McBean
Elizabeth Coulsen
Anita Hendricks
Amelia McBean

| | |
|---|---|
| May Golden | Eva James |
| Jane Harrison | Albertha Green |
| Elaine Joseph | Charlotte Benjamin |
| Ann Jackson | Corolina Michael |
| Veronica Bastian | Anesta Foster |
| Dorcas Lee Agaard | Sr. Emma Francis |
| Agnes Emmanuel | Hyacinth Williams |
| Lucy Jarvis | Paula Rivers |

Each of these plaintiffs has all the qualifications required by the provisions of section 18 of the Amalienborg Code of 1906 (Colonial Law of Apr. 6, 1906; prec. 1 V.I.C.). The only reason why the names of these plaintiffs were not placed upon the respective election lists in Frederiksted is that they are women.

At the trial of the Order To Show Cause why the names of the plaintiffs should not be placed upon the respective voting lists for the period from April 1, 1936, to March 31, 1937, in the Town of Frederiksted, it was orally agreed to by all the parties that this case and the companion case of Marie Richards v. The Elective Board for the Election District of the Town of Frederiksted, (1936, No. 120; see p. 351, this volume), should be argued together. It was also agreed that all the persons, who had signed certain slips (see Exhibit A) were to be considered as proper parties plaintiff. It was further agreed that irregularities of procedure on the part of the respective Elective Boards should be deemed waived by both sides for the purposes of these cases, although the Court would consider these irregularities and their legal effects in deciding the case.

The Court sanctioned the foregoing agreements so that (1) the rather unusual pleadings could be considered, clarified, and corrected by the Court, (2) the proper procedure to be followed by the Elective Boards, in the future, might be indicated and established by the Court, and (3)

the substantive question of the right of women to vote in the Virgin Islands might be reaffirmed in the judgment given by the Court.

Two of the defendants, Maguire and Dorsch, appeared to plead their willingness to place the names of the plaintiff upon the respective election lists, and, also to show that they were unable to carry out their desire and duties because the Chairman of the respective Elective Boards had not called meetings for those purposes. They asked that the Chairman be enjoined to call meetings of the respective Elective Boards, for the purpose of placing the names of the plaintiffs upon the respective election lists.

The defendant, Skeoch, appeared in his own behalf to state that he personally believes that women should be permitted to vote, but that he also believes that the plaintiffs could not legally vote under existing law. He also stated that as a member of the Elective Board for the Country District of Frederiksted, he had followed the views of the Chairman of his Elective Board as to all matters of law and procedure, when the Elective Board of which he was a member held its meeting.

The defendant, Golden, was absent on matters of public interest in Washington, D.C. He was not represented by counsel. His position, however, is clearly stated in the minutes of the so-called "joint meeting" of the Elective Board for the Town District of Frederiksted and the Elective Board for the Country District of Frederiksted, held February 14, 1936, and also from his vote against placing the names of the plaintiffs on the election lists as found in the minutes of the meeting of the Elective Board for Frederiksted Town and Suburbs held February 14, 1936. He believes (a) that women have no right to vote in the Virgin Islands of the United States, (b) that the decision of the District Court of the Virgin Islands, which was given in St. Thomas in the matter of woman suffrage (Petition of

Edith Williams, et al. v. The Elective Boards for the Town and Country District of St. Thomas, No. 14–1935, St. Thomas) is not operative in its effects in the Municipality of St. Croix.

The defendant, Jackson, who is Chairman of both Elective Boards, appeared in his own behalf, filed a plea which he called a "demurrer", and made elaborate and extensive argument in support of his position.

All four of the defendants who were present testified freely and frankly, under oath, as to the facts which the Court needed to consider on the Rule to Show Cause. Some of the plaintiffs also testified under oath as to the existent facts.

The following are the basic questions which call for consideration and decision:

1. What is the legal relation between a petition for a writ of mandamus and a demurrer or answer to an alternative writ of mandamus which is issued in response to the petition?

2. What is the proper method of procedure for the Elective Board to follow in framing the election list under the election laws as found in the Amalienborg Code of 1906 (supra)?

3. Is the Constitution of the United States in force and effect in the Virgin Islands?

4. Is the Nineteenth Amendment operative upon the power of Congress to legislate for the Virgin Islands, so as to prevent the Congress of the United States from legislating for the Virgin Islands, or from sanctioning legislation for the Virgin Islands which discriminates against the right of citizens of the United States to vote in the Virgin Islands, because those citizens are women?

5. Are women entitled to the right to vote in the Virgin Islands under the provisions of section 18 of the Amalienborg Code of 1906?

6. Have the plaintiffs a speedy and adequate remedy at law?

Each of these questions will be taken up in turn.

# I

■ We first consider the so called "demurrer" which was entered by the defendant, Jackson, as shown by the files. The defendant has misconceived the intention and effect of Title III, chapter fifty-three, section 7 of the Code of Laws for the Municipality of St. Croix (1921). This section states that " . . . the defendant on whom the writ shall have been served may show cause by demurrer or answer to the writ in the same manner as to a complaint in an action."

This language does not mean that the alternative writ of mandamus takes the place of a complaint filed by the plaintiff. The complaint is the background for the writ. The writ must be read in connection with the complaint. The writ simply informs the defendant of the act which he is to perform, and states the basic reasons and facts on which the demands made upon him are founded. The writ also permits him to decide whether he will perform, or will show cause as to why he should not perform [See 1921 Code, Title III, ch. 53, § 5■]. Section 7 (supra) indicates the two ways by which he may show cause: (1) demur to the writ, or (2) answer the allegations made in the writ. The procedure to be adopted is that which appertains to a demurrer or an answer in an ordinary action. That procedure is found in the Code of Laws for the Municipality of St. Croix (1921), Title III, ch. 53, §§ 7-9*.

■ The vice of the pleading filed by the defendant, Jackson, is that it is neither a demurrer nor an answer. It contains some elements of each. From their combination the pleading is practically self-destructive. The proper practice would be to file a demurrer to the alternative writ, and, if the demurrer is overruled, then to file a motion asking

leave of the Court to plead over by way of answer. If the motion is granted an answer may be filed; thereafter issues may be joined and the matter proceeded to trial.

We therefore first consider the pleading filed by the defendant, Jackson, to be a demurrer. We overrule the demurrer. We now assume that a proper motion to plead over was made, and granted, and proper answer was filed, and that the parties thereafter proceeded to trial. The defendants presented testimony to show cause why they should not place the names of the plaintiffs on the voting lists of Frederiksted. The plaintiffs presented testimony in their own behalf. The defendants agreed at the trial that the names of the plaintiffs should be placed upon the respective voting lists in Frederiksted, if women had the legal right to vote in the Virgin Islands.

In view of the agreements between the parties that irregularities of pleading should be ignored by the Court, we need take no further notice of the demurrer.

## II

We turn now to the procedure which should be followed by the respective Elective Boards under the election laws as found in the Amalienborg Code of April 6, 1906 (Colonial Law of Apr. 6, 1906; prec. 1 V.I.C.). This calls for a complete analysis and construction of sections 14 to 27 of the Amalienborg Code of April 6, 1906, which deal with the making of the respective election lists.

These provisions have been established as the basic election laws in the Virgin Islands by the Organic Act of the Virgin Islands, passed by the Congress of the United States, in the Act of March 3, 1917, (chapter 171) section 2 (39 Stat. 1132; 48 U.S.C. § 1392).

This section reads as follows:

"Section 2. That until Congress shall otherwise provide, in so far as compatible with the changed sovereignty and not in conflict

313

with the provisions of this Act, the laws regulating elections and the electorial franchise as set forth in the code of laws published at Amalienborg the Sixth Day of April, Nineteen Hundred and Six, and the other local laws, in force and effect in said Islands on the Seventeenth Day of January, Nineteen Hundred and Seventeen, shall remain in force and effect in said Islands, and the same shall be administered in said Islands, and the same shall be administered by the civil officials and through the local judicial tribunals established in said Islands respectively; and the orders, judgments, and decrees of said judicial tribunals shall be duly enforced."

It is clear that the election laws which are found in the Amalienborg Code of 1906, are expressly kept in force and effect only so far as they are not in conflict with the provisions of the Act of March 3, 1917, and so far as they are "compatible with the changed sovereignty."

■■ These two conditions must be met by each segment of the Amalienborg Code before that segment can have the force of law in the Virgin Islands.

It is difficult to express with exactitude what is meant by the phrase "compatible with the changed sovereignty." The (United States) Circuit Court of Appeals for the Third Circuit has indicated that the phrase connotes American ideals and principle of government, at least so far as those ideals and principles can be found in the Constitution of the United States, and the laws of the United States, and as found in the interpretations of the Constitution, and the laws of the United States, namely, by the United States Supreme Court (Soto v. U.S. 273 Fed. 628 [see p. 536, this volume]). In this the Circuit Court of Appeals for the Third Circuit is supported by the United States Supreme Court, which has said: "Even in construing the term of a statute, Courts must take notice of the history of legislation and out of different possible constructions so hold and apply the one that best comports with the founding of our institutions and is therefore most likely to have been the construction intended by the law making body." (Texas, etc., R.R. Co.

v. Interstate Commerce Commission, 162 U.S. 197, 218 [16 S. Ct. 666, 40 L. Ed. 940]).

This court has adopted the same principles of interpretation of the phrase in the case of The People v. Francis, No. 12-1935, St. Thomas, and Edith Williams, et al. v. Elective Boards for the Town and Country District of St. Thomas, St. Thomas (supra). In the former case we said: ". . . . The phrase: 'in so far as compatible with the changed sovereignty' is not at all clear. Its meaning has not been clarified by previous decisions. (Soto vs. U.S., 273 Fed. 628 [see p. 536, this volume]; Braffith vs. People of Virgin Islands, 26 Fed. (2d) 646 [see p. 582, this volume]; Sugar Products Co. vs. St. Thomas Ship Brokers' Association, 280 Fed. 821 [see p. 556, this volume]; Jackson vs. Police Court, etc., Virgin Islands, 286 Fed. 920 [see p. 563, this volume]; Clen vs. Jorgensen, 265 Fed. 120 [see p. 497, this volume]; U. S. v. Malmin, 272 Fed. 785 [see p. 512, this volume]). Reading the statute as a whole it is clear that Congress did not intend to make a complete and entire break with the existing Danish law (Soto vs. U.S. 273 Fed. 628, 634 [see p. 536, this volume]; Clen vs. Jorgensen, 265 Fed. 120, 123-124 [see p. 497, this volume]; Braffith vs. People of the Virgin Islands, 26 Fed. (2d) 646, 648 [see p. 582, this volume]). It is evident, too, that Congress intended to retain as much of the pre-existing Danish law as would be consistent with out Constitutional form of Government, with American ideas and American ideals, at least to the extent that those ideas and ideals are found in the Constitution of the United States (Ibid, supra), and with the recognized inherent powers which the United States has under those principles of International Law which have been incorporated in our jurisprudence. (See U.S. vs. Arjona, 120 U.S. 484 [479, 7 S. Ct. 628, 30 L. Ed. 728]; U.S. vs. White, 27 Fed. 200). Furthermore, Congress is familiar with the Constitution of the United States and

with the decisions of the United States Supreme Court inter-
preting and construing that document. Congress is pre-
sumed to have the Constitution and the decisions of the
Supreme Court in mind when enacting laws. It is, therefore,
reasonable to assume that the phrase: 'compatible with
the changed sovereignty' referred, at least, to the basic
principles of government found in the Constitution of the
United States and to the decisions of the Supreme Court
that all Constitutional provisions relating to substantive,
human rights were to be in full force and effect in the
Virgin Islands. Whatever was compatible (that is, consist-
ent, consonant) with those principles and constitutional
provisions was to remain and could be followed. Whatever
was not compatible with those principles and constitutional
provisions was not to remain and could not be followed."
We reaffirm the principles stated in that case. We apply
the principles set out in the foregoing cases to the present
controversy as we take up each of the pertinent sections of
the Amalienborg Code in order, and examine it in detail.
We are here concerned with sections 14 to 27 inclusive of
said code.

 Section 14 reads as follows:

"The Colonial Council for the Island of St. Croix shall consist
of 13 members elected by popular elections, and of 5 members nom-
inated by the King.

"The Colonial Council for the Island of St. Thomas with St.
Jan shall consist of 11 members elected by popular elections, and
of 4 members nominated by the King."

This section is material to the present controversy be-
cause the elections in which the plaintiffs claim the right
to vote are elections for the Colonial Council created by
section 14.

It is quite obvious that the phrase, "and of 5 members
nominated by the King", as found in the first paragraph
of section 14, and the phrase, "and of 4 members nominated

by the King", as found in the second paragraph of section 14, are not compatible with the changed sovereignty. The King referred to was clearly the King of Denmark, but the people of the United States accepts no king as their overlord or sovereign. They themselves are the only sovereign power in the United States. The King of Denmark has no authority over any legislative body functioning in territory belonging completely and entirely to the United States.

The phrase "nominated by the King" refers to persons nominated to the Colonial Councils in the Virgin Islands and became legally non-existent at the moment when the Danish West Indies became part of the territory belonging to the United States. The Congress of the United States has nowhere given to the King of Denmark the power to nominate members of the Colonial Council for St. Croix, or to nominate members of the Colonial Council for St. Thomas.

We must therefore hold that section 14 must be read as follows:

"The Colonial Council for the Island of St. Croix shall consist of 13 members elected by popular election.

"The Colonial Council for the Island of St. Thomas with St. Jan shall consist of 11 members elected by popular election."

Section 15 reads as follows:

The Island of St. Croix is divided into 4 Elective Districts, viz:

"(1) .the town of Christiansted and suburbs, which district shall elect 3 members;

"(2) The Country Jurisdiction of Christiansted, which district shall elect 4 members;

"(3) the Town of Frederiksted, which district shall elect 2 members;

"(4) the Country Jurisdiction of Frederiksted, which district shall elect 4 members."

It is clear in this section that the Island of St. Croix is divided into four elective districts, and that a given number

of members of the Colonial Council for St. Croix, are to be elected in each district.

Section 16 contains similar provisions concerning the Islands of St. Croix and St. Jan.

Section 17 and section 19 refer to the qualifications and terms of office of the members of the respective Colonial Councils. We need refer to them only in passing. No questions concerning these sections are involved in the instant case.

Section 18 will be examined in detail later in this opinion. Section 20 reads as follows:

"The elections in every district are to be under the superintendence of a Board of Directors, consisting of the Judge in the Jurisdiction as chairman and of two inhabitants of the municipality, the one appointed by the Superior |Authority, and the other by the respective Colonial Council. In case of no one being appointed by the Colonial Council, or any one appointed being prevented from officiating at the election, the chairman must appoint another qualified inhabitant to act temporarily as a member of the Board.

"A Protocol, duly authorized by the Superior Authority, must be furnished the Elective Board, to which all communications and the Election Lists are to be produced. In this protocol the most essential points of the proceedings of the Board and the result of the elections are to be entered. The protocol must be signed by the Directors at the close of each meeting, and remain in the charge of the chairman.

"In case of a diversity of opinion between the members of the Board, the majority of votes decides the question, but the Minority has the right of entering their dissenting vote in the Election Protocol."

We are greatly perplexed and amazed by the fact that the phrase "Board of Directors" appears nowhere else in the election laws as found in the Amalienborg Code of 1906. The only group which is to function in election matters, which is expressly referred to elsewhere in the election laws is called "the Elective Board." It is further a matter of amazement that the personnel of the "Elective Board" is no-

318

where expressly indicated or provided for, nor are there any express provisions for the duties of the "Board of Directors", or the method of procedure by which that Board is to function.

Under a strict and literal construction of section 20, the elections are to be under the superintendence of a "Board of Directors", but the detailed activities of preparing for, and conducting the elections must be carried out by an "Elective Board" of unknown personnel, and the appointment of the unknown personnel is left indefinite and also unknown. The practical procedure, however, both under the Danish regime, and the American regime, up to this time, has been to consider that the "Elective Board" in the various elective districts properly consists "of the Judge in the Jurisdiction as Chairman" and of two other members, one appointed by the Governor and another appointed by the Colonial Council. It is therefore reasonable to suppose that the phrase "Board of Directors" and the phrase "Elective Board" refer to the same group. And we so hold. We further hold that the phrase "Board", as found at the end of the first paragraph of section 20, and the phrase "of the Board" as found in the second sentence of the second paragraph of section 20, and the phrase "the members of the Board", as found in the third paragraph of section 20, and the phrase "the Directors", as found in the third sentence of the second paragraph of section 20, all refer to the membership of, and the function of, the "Elective Board."

The phrase "in every district" is clearly related to and refers to, the elective districts created by Section 15 and Section 16.

The meaning of the phrase "judge in the jurisdiction", however, is not so obvious. So far as we have been able to ascertain it the history of the local judiciary seems to be as follows:

Prior to 1900 there was a Police Court and a Lower

Court in St. Thomas, St. John, Christiansted and Frederiksted. Each court had its own judge. There also existed a court known as the West India Upper Court. This was presided over by a Judge of the Upper Court. The West India Upper Court was an appellate court. Its jurisdiction existed throughout the entire Danish West Indies. To it were brought appeals from all the Police Courts and all the Lower Courts. For reasons of economy, the several Police Courts and the several Lower Courts were gradually combined.

As the various judges retired on pension, or resigned from their offices, the judgeships were also amalgamated. By 1916 the various Police Courts and Lower Courts had been consolidated into three Lower Courts. One Lower Court had jurisdiction over the Town and Country District of Christiansted; another had jurisdiction over the Town and Country District of St. Thomas, and the Island of St. John. One judge presided over each Lower Court (see the laws and ordinances for 1906 for the Kingdom of Denmark).

In 1907, the West India Upper Court was abolished. Appeals from the Lower Courts were to be taken to the Danish Courts in Copenhagen (see the law of March 22, 1907; Laws of Denmark published in "Lovtidenden" March 30, 1907; English translation will be found in The St. Thomas Tidende, Volume 61, No. 42, May 25, 1907). This statute is of great importance when we consider section 26 of the Amalienborg Code of 1906, as we shall do later on.

It seems then that by 1916, the phrase "Judge in the Jurisdiction" referred to the Judge of the Lower Court in each of the three places, Christiansted, Frederiksted, and St. Thomas.

When the United States acquired the Danish West Indies, they accepted (Code of Laws for St. Thomas, Chapter I; Code of Laws for St. Croix, Chapter I) the existing Judicial system. This system continued until the end of 1921. In

December, 1921, by identical legislation, the Colonial Council of St. Thomas, and the Colonial Council of St. Croix, created a new judicial system (see 1921 Codes, Title I, ch. 1).

This legislation was locally accepted as binding, and in force and effect throughout the entire Virgin Islands of the United States. Under this legislation three Police Courts were created, one for the Town of Charlotte Amalie (St. Thomas), one for Christiansted, and one for Frederiksted. When the new Police Court system was established by the above mentioned legislation in 1921, the Police Court Judges succeeded "to the various commissions and boards of which the Judge of the Ordinary Town Court (i.e. the Lower Court) or the Police Master (Judge of the Police Court) is or was a member . . .". (1921 Code, Title I, ch. 1, § 35; 4 V.I.C. § 246 note).

At first each Court had its own Judge. Later on the functions of the Police Court Judge for Christiansted, and the Police Court Judge for Frederiksted were combined in the same person. At present there are two Police Court Judges. One Judge presides over the Police Courts in St. Croix. One Judge presides over the Police Court in St. Thomas. The police offenses on the Island of St. John are handled by a lay commissioner.

At present therefore the phrase "Judge in the Jurisdiction" refers to the Police Court Judge in St. Croix, and to the Police Court Judge in St. Thomas, so that the elections in every election district are now under the superintendence of an "Elective Board", which consists of the Judge of the Police Court, and "two inhabitants of the Municipality." There is nothing to indicate that the inhabitants of the Municipality must also be residents of the elective district in which the election is to be held. They may reside anywhere within the Municipality within which the elective district is situated.

One of the two inhabitants must be appointed by "the Superior Authority." Section 10 of the Amalienborg Code provides that "The Governor is the Superior Authority for both districts." The phrase "both districts" refers to the language in the preceding first paragraph of section 10. It is clear then that one of the members in each Elective Board must be appointed by the Governor of the Virgin Islands. The other member of each Elective Board must be appointed by the Colonial Council who has jurisdiction over the elective district. It follows, therefore, that the Colonial Council for the Island of St. Croix, may appoint a member of each Elective Board for each of the four elective districts on the Island of St. Croix; and the Colonial Council for the Island of St. Thomas and St. John may appoint a member of each Elective Board for each of the elective districts in the Island of St. Thomas and St. John.

The Island of St. Croix has four elective districts (see section 15). Each district has its own Elective Board. The Elective Board in each district consists of the Judge of the Police Court, who acts as Chairman, and the two appointed members (section 20).

The second sentence of section 20 is of extreme importance: "In case of no one appointed by the Colonial Council, or any one appointed being prevented from officiating at the election, the Chairman must appoint another qualified inhabitant to act temporarily as a member of the Board."

It must not be forgotten that an election does not consist simply of the actual casting of ballots. It consists of a connected and inter-related series of activities which begin with the creation of the Elective Board, go through with the ascertaining and listing of those who are qualified electors, and end with the final notification of the successful

candidates for office, that they have been elected (sections 21 to 31, inclusive).

This makes it clear that the provisions in the second sentence of section 20 are mandatory. They impose upon the Chairman the duty to see that the Elective Board is complete as to personnel every time that the Elective Board functions. The Elective Board cannot take any official action, if any one of its members is absent.

All three members of an Elective Board must be present and voting before any action taken by that Board can be legal and binding. This is made especially clear by the phrase in paragraph three of section 20 which says that: "In case of a diversity of opinion between the members of the Board, the majority of votes decides the question, but the Minority has the right of entering their vote in the Election Protocol."

It is obvious there can never be a majority of those voting when only two members of the Elective Board are present, and each one voting in opposition of the other. Only when a full Elective Board meets can the provisions of the paragraph be carried out.

Nowhere in the Amalienborg Code of 1906 (or in the Amalienborg Code of 1863, of which the Amalienborg Code of 1906 is an amended enactment), is any authority given to the several Elective Boards to hold joint-meeting sessions. There is of course no reason why the Elective Boards should not meet together to discuss common problems, and even to devise plans for carrying out their several duties in a uniform manner, but each Elective Board must carry out its official duties as a separate entity. In no other way can its acts become legal and binding.

It should also be noted that the Amalienborg Code of 1906 is silent as to the place where the Elective Boards are to meet. It is reasonable to suppose, however, that it

was the legislative intent to have the Elective Boards meet in their respective election districts; otherwise great and unnecessary inconvenience would be imposed upon the electors, who might have to lose both time and money, in going from their home in one elective district, to attend meetings of their own Elective Board which were held in another district, and to which meetings the electors would properly be summoned (see section 25).

The foregoing considerations are of great importance in the instant case. The so called "joint-meeting" of the Elective Board for the Town District of Frederiksted, and the Elective Board for the Country District of Frederiksted, and the Elective Board for the Country District of Frederiksted, which took place on January 9, 1936, was not a legal meeting of either of these Boards. Each Elective Board should have met separately. Furthermore, the full membership of each Elective Board was not present. One member was missing from each Board. When the "joint-meeting" voted to place the name of the petitioners upon the voting lists, that vote was ineffective to carry out the purpose of the majority, because neither Elective Board could function legally in a "joint-meeting." If the "joint-meeting" is considered to be an advisory meeting, then the advice it may decide upon would not bind the several Elective Boards, when they function at a lawful meeting.

When we consider the meetings held by the Elective Board of the Frederiksted Country District, and the meeting held by the Elective Board of the Frederiksted Town District, we also find difficulties.

The Elective Board for Frederiksted Country District met on February 14, 1936. At this meeting only two members, Jackson and Maguire, were present. One member, Skeoch was absent. Yet it was at this meeting that the voting list was framed, and ordered to be exhibited from Feb-

ruary 15th to February 28th, inclusive. It appears, therefore, that the election list was not properly framed. We do not need to consider this matter now, but the members of the Board, who were present either in person, or by substitute were put on notice at this meeting, that certain women, among whom are the plaintiffs in this case, were found to have all the qualifications of electors, under section 18 of the Amalienborg Code of 1906.

This is so because the meeting had definitely and expressly before it the list of women who were found to be qualified at the so called "joint-meeting." At this time, therefore, the Elective Board for Frederiksted Country District knew, or had reasons to suppose, that these women were qualified as electors (see section 22, paragraph 2).

The next meeting of the Elective Board for Frederiksted Country District took place on March 10, 1936. All three members of the Board for Frederiksted Country District were present. The election list as framed and exhibited was presented for final acceptance.

Apparently, no objection to the list as framed and exhibited had been made. The election list as framed and exhibited, did not, so far as the facts show, contain the names of the women who were found qualified to be electors by the so called "joint-meeting." The reason why the names of these women did not appear on the election list as framed and exhibited, was because of the action taken by the Chairman of the Board at the meeting on February 14, 1936, when he overruled the motion of the defendant, Maguire, to place the names of the women upon the voting list upon the ground "that the Colonial Law debars women from voting in this Municipality." (See Minutes of meeting of the Elective Board for Frederiksted Country District, February 14, 1936).

The election list for the Frederiksted Country District

for the period from April 1, 1936, to March 31, 1937, was adopted. This list does not contain the names of the plaintiffs.

As the meeting was a legally held meeting with all three members of the Board present, it may be accepted that they ratified the framing and posting of the election list, which was exhibited from February 15th to February 28, inclusive. But as the election list was not validly framed and exhibited, it is doubtful that those persons whose names did not appear on the exhibited election list, were required to take into account the provisions of section 25, which we shall consider later, at the time that the invalid .election list was exhibited. Furthermore, no opportunity was given, or could have been given to persons whose names did not appear upon the election list as exhibited to protest against such omission after March 10th. The plaintiffs, therefore did not as a matter of fact have a legal opportunity to object to the omission of their names from the election list as posted.

As the plaintiffs were deprived of whatever legal right they might have had in this matter by the irregular activities of the Elective Board for the Frederiksted Country District, they would necessarily be entitled to such legal relief as this court might be under a duty to give them, but in view of the agreements made between the parties, that the irregularity of conduct by the Elective Board was to be ignored, we may take it as a fact that the election list, as framed and exhibited, was properly framed and exhibited; that the plaintiffs properly and formally protested against the omission of their names from the election lists as framed and exhibited, and that the Elective Board for the Frederiksted Country District denied the application of the plaintiffs; and that therefore, the election list as finally adopted did not and could not contain the names of the plaintiffs.

We turn now to the activities of the Elective Board for the Frederiksted Town District. We find a similar situation. A meeting was held by this Elective Board on February 14, 1936. At this time all three members of the Board, Jackson, Golden and Dorsch were present. The names of some of the plaintiffs were recommended to be placed on the voting list, which was to be exhibited from February 15th to February 28th, inclusive. The recommendation was not accepted. The defendants, Jackson and Golden, voted against the recommendation. The defendant, Dorsch, voted in favor of the recommendation. The voting list was then properly framed and ordered to be exhibited according to law.

It seems to be clear that all the activities which took place at this meeting were formally correct and legal.

After the voting list was framed and ordered to be exhibited according to law, the plaintiffs presented a formal protest to the Elective Board against the omission of their names from the voting list.

On Wednesday, February 26, 1936, the Board formally met to consider the protest made by the plaintiffs. At this meeting all three members of the Board were present. The women were present either in person or by proper representation. The Elective Board considered the protest of the plaintiffs, deciding against the contention made by the plaintiffs, and made a formal award, as required by law.

This award denies the right of the plaintiffs to be upon the voting list simply upon the ground, "although they possessed all the other qualifications required of voters in this Jurisdiction, the Colonial Law did not provide for the admission of women to the franchise . . " (see minutes of meeting of the Elective Board for Frederiksted Town District held February 26, 1936).

Copies of the award were given to the plaintiffs in due course.

The Elective Board then met again on Tuesday, March 10, 1936. At this time only two of the members of the Elective Board were present, namely, the defendants, Jackson and Golden. At this meeting the voting list as framed and exhibited was adopted as the official voting list for the period April 1, 1936, to March 31, 1937.

Here again, it is to be noted that the action of the Elective Board on Tuesday, March 10, 1936, was not in accord with the express provisions of the Colonial Law. But under the agreements between the parties, to which we have already referred, the irregularities need not be considered. We may consider that to have been done, which should have been done.

The result is that the official voting list for Frederiksted Town District did not contain the names of the plaintiffs.

At this point we may consider the argument which was pressed with great earnestness upon the Court by the defendant, Jackson; that the election list which is framed and exhibited from the 15th to the 28th of February is "merely a tentative list and that the real election list does not come into legal being until the time when persons may act under section 25, of the Amalienborg Code. We believe that this argument is without merit.

Section 21 provides that:

"The elections are to take place according to lists containing the names of the persons entitled to vote, which lists are to be drawn up every year."

This provision is mandatory. Section 21, however, must be read in connection with section 22, section 23 and section 24.

Under section 22 the Chairman must give public notice to those who are entitled to vote to furnish him "within the end of the month" with any information which may establish that such persons are entitled to be placed upon the

328

election list. It is clear that this information must reach the Chairman of the Elective Board not later than December 31st.

Under section 23, the Chairman may, during the month of January, obtain any further information he can concerning the right of persons to be placed upon the voting list. The Elective Board must meet "in the first days of February", and the Elective Board "must, within 8 days, frame the Election List."

It is to be noted that the phrase "first days of February" is quite indefinite, and that the phrase "within 8 days" does not clarify the existent vagueness. But in view of the express provisions of section 24 that the election list must be exhibited "from the 15th to the 28th of February", it is clear that the election list must be framed sometime before the 15th of February. The Elective Board must frame the election list "within 8 days", and as the Elective Board must meet "in the first days of February", it is reasonable to suppose that it was the legislative intent to have the election list framed not later than the 14th of February. It is also reasonable to suppose, that it was the legislative intent to allow the Elective Board to take 8 days for the actual framing of the election list. The phrase "within 8 days" must, therefore, be held to mean within 8 days after the Elective Board has met in the first days of February. The result is that the Elective Board must have its February meeting sometime between the first and sixth day of February, and the election list must be completely and fully framed sometime between the 9th and the 14th day of February. Thereafter, the list may be corrected; names which have been improperly or inadvertently omitted may be added; names which are illegally upon the voting list may be challenged and removed; but the official election list must be framed as a complete entity, so far as the

activity of the Elective Board is concerned by the 14th day of February. This is quite clear because of the expressed language of section 24 in which the phrase "the election list thus framed" clearly refers to the phrase "framing the election list" as found in section 23, paragraph 1. Furthermore, the election laws constantly refer to "the election list" or to "the list." Nowhere in the election laws can be found any reference to any "tentative" election list. At this point we must note that section 23 makes it mandatory upon the Elective Board to place upon the election list detailed and specific information concerning each qualified elector, as follows:

1. Full name.
2. Age.
3. Vocation.
4. Whether the elector is a citizen of the United States (native of the Danish West Indies), or has simply been a resident of the Virgin Islands for 5 years.
5. The length of time that the elector has lived in the Municipality.
6. The length of time that the elector has lived in the particular elective district.
7. Whether or not the elector owns property which will yield the yearly rental required by the provisions of section 18.
8. Whether or not the elector had the yearly income specified by the provisions of section 18.

We repeat that the foregoing information must appear upon the voting list. The provisions of section 23 cannot be directory, but must be mandatory, because the failure to possess any of the qualifications stated gives a ground for challenge under the provisions of section 25.

It is clearly the duty of the Elective Board to frame the election list (section 22, paragraph 2; section 23, paragraph 1). Here again it is to be emphasized the Elective Board

must function as an entity. A majority vote can decide all questions before the Elective Board, but a full Board must be present and acting before any official binding act by the Board can take place (section 20).

In passing we may note the argument made by defendants, Jackson and Skeoch, that in framing the election list they followed the Rules for the election of members of the Colonial Council for the Danish West India Islands, and the Rules of Business of the Colonial Council of St. Croix. After a careful examination of the two documents referred to we find absolutely nothing in them which in any way relates to the framing of the election lists or to issues in the present controversy. (For these documents see Appendix 3).

### III

■-■ Is the Constitution of the United States in force and effect in the Virgin Islands? We hold that it is.

In the first place the Supreme Court of the United States has repeatedly held that the Constitution of the United States is the supreme law of the United States, and as such supreme law is in force and effect in the territories of the United States, including the insular possessions of the United States. (See the Insular Cases, 182 U.S. 1 et seq., [21 S. Ct. 743 et seq., 45 L. Ed. 1041 et seq.], and companion cases; see also Balzac v. Porto Rico, 258 U.S. 298 [42 S. Ct. 343, 66 L. Ed. 627]).

Furthermore, though it is true that territories of the United States are entirely within the jurisdiction of the Congress of the United States (National Bank v. Yankton, 101 U.S. 129 [25 L. Ed. 1046]; Murphy v. Ramsey, 114 U. S. 15 [5 S. Ct. 747, 29 L. Ed. 47], the power of Congress to legislate for the insular possessions of the United States is not unlimited. The powers which Congress may exercise are only those which are not expressly forbidden to Con-

gress (Dred Scott v. Sandford, 19 How. 393, 614 [15 L. Ed. 691]; Dorr v. The United States, 195 U.S. 138 [24 S. Ct. 808, 49 L. Ed. 128]).

Though it may be true that a specific provision in the Constitution of the United States may not be applicable to a given insular possession, that fact does not invalidate the general principles that the Constitution of the United States is the Supreme Law in all insular possessions, and therefore, it is the supreme law in the Virgin Islands. It follows, therefor, that all governmental activities in the Virgin Islands are subject to that supreme law, and the (United States) Circuit Court of Appeals for the Third Circuit has so held (Soto v. U.S., 273 Fed. 628 [see p. 536, this volume]; Jackson v. Police Court, etc., 286 Fed. 920 [see p. 563, this volume]).

In the next place the Constitution of the United States is operative in the Virgin Islands by force of Congressional enactment. Section 1891█ of the Revised Statutes of the United States provides:

"Sec. 1891. The Constitution and all laws of the United States which are not locally inapplicable shall have the same force and effect within all the organized Territories, and in every Territory hereafter organized as elsewhere within the United States."

The Virgin Islands are an organized territory; they were an organized territory under Danish rule. They then had all the basic elements of an organized territory. There was land, which was inhabited by human beings living under a civilized form of Government. They had (1) a basic law, Amalienborg Code of 1863 (Colonial Law of Nov. 27, 1863), as modified by the Amalienborg Code of 1906 (Colonial Law of Apr. 6, 1906; prec. 1 V.I.C.), (2) a Chief Executive, the Governor, (3) a legislative assembly in each of two organized municipalities, (4) power in the Legis-

lative Assemblies by joint action to legislate for the entire Danish Islands, although the legislative power was subject to the approval of the King and Diet in Denmark, (5) a Judiciary, consisting of lower, general, and appellate courts, (6) an elaborate administrative organization, (7) popular elections and, (8) a great degree of supervised local autonomy. This complex organization existed when the United States acquired the Virgin Islands. The United States accepted and continued the then existing organization (Act of March 3, 1917 [ch. 171], section 2 [supra]). The organization is "compatible with the changed sovereignty." It is entirely consistent with the provisions of the Act of March 3, 1917. Congress has never changed that organization, on the contrary it has continuously and expressly recognized the continued existence of that organization (48 U.S.C., chap. 7. It is unnecessary to list at this time the several Acts of Congress which are applicable to the Virgin Islands by express reference or by inescapable judicial construction).

One cannot question, at this late date, that the Virgin Islands have been an organized territory of the United States since their acquisition, and that they are an organized territory at the present time. And we so hold.

In so holding we are not unmindful of the opinion given by the Attorney General of the United States that the Virgin Islands are not an organized territory (31 Op. Atty. Gen. 118). With all due deference we point out that the attention of the Attorney General was apparently not called to the Act of March 3, 1917, by which Congress accepted and continued the then existing organization in the Virgin Islands. We venture to believe that had he examined that Act, he would have decided that the Virgin Islands were an organized territory.

Nor is our holding contrary to the decision of the (United

States) Circuit Court of Appeals for the Third Circuit in the case of Soto v. U.S., supra. In that case the Circuit Court of Appeals for the Third Circuit simply said, arguendo, that the Virgin Islands were not "an incorporated territory of the United States." But an unincorporated territory may be an organized territory, so that Congressional enactments relating only to incorporated territory may not be applicable to the Virgin Islands, while Congressional enactments dealing with organized territories are applicable to the Virgin Islands.

As section 1891 of the Revised statutes expressly extends the Constitution of the United States, and the laws of the United States, which are not otherwise inapplicable to territories of the United States, which are organized subsequently to the time when section 1891 was enacted, i.e., 1879 [1875], and as the Virgin Islands were accepted as an organized territory in 1916, and continued as such by the Act of March 3, 1917 (ch. 171, § 2, supra), it necessarily follows that the Constitution of the United States, and the laws of the United States, not otherwise inapplicable, are in force and effect in the Virgin Islands.

██ ▪ ██ And it must not be forgotten that where the Constitution has once been extended by Congress to the territories, Congress and the territorial legislature cannot enact laws inconsistent therewith (Downes v. Bidwell, 182 U.S. 244 (271), 21 S. Ct. 770, 45 L. Ed. 1088 (1100)). Furthermore, once the Constitution has been attached to territory of the United States by operation of a statute, no subsequent repeal of that statute by Congress can detach the Constitution again. Thus the fact that section 1891 of the Revised Statutes was repealed in 1935 [1933█] is immaterial. It was in force and effect when the United States

acquired the Virgin Islands. Its repeal does not undo the operative effect which it had in 1916 and 1917.

Furthermore, our holding is not contrary to the decision of the United States Supreme Court in the Insular Cases (supra) as summed up in the Balzac Case (supra).

Without presenting at this time a detailed analysis of the Balzac case we deem it sufficient to say that the citations of law and facts which lead the Supreme Court to decide that section 1891 of the Revised Statutes of the United States did not apply to Puerto Rico cannot be made so far as the Virgin Islands are concerned. A glance at the Treaty between the United States and Spain through which the United States acquired the Philippine Islands and Puerto Rico, and a reading of the Organic Act[s] for those Islands █ will show that the position which we take is sound. It is enough to say now that the status of the Virgin Islands is very much like that of Alaska (see Congressional Record, Vol. 54, 4 August 3647-3851; 3687-3689, 3709; Vol. 54, 5 August 4826).

Finally, the Treaty between the United States and Denmark (prec. 1 V.I.C.) under which we acquired the Virgin Islands, which shows that the United States intended to have the Constitution of the United States apply to the Virgin Islands (see the reservations made by the Senate of the United States in its resolution of ratification, which reservations were accepted by Denmark and incorporated by reference in the Treaty).

█ It is true that the power which Congress has under the provisions of Article IV, section 3, clause 2, of the Constitution of the United States (prec. 1 V.I.C.),

to govern the territories of the United States, must be exercised in accordance with the provisions of the amendments to the Constitution. If there is any conflict between the provisions of Article IV of the Constitution, and the amendments to the Constitution, the provisions in the amendments must control under the rule that the last expression of the will of the People of the United States prevails over any earlier expression (Fairbanks v. United States, 181 U.S. 283, 21 S. Ct. 648, 45 L. Ed. 862; Legal Tender Cases, 12 Wall. 457 (531), 20 L. Ed. 287 (306). It must follow, therefore, that the Fifteenth Amendment and the Nineteenth Amendment to the Constitution of the United States (prec. 1 V.I.C.) control any power which Congress may have, and exercised, under the provisions of Article IV, section 3, clause 2, of the Constitution of the United States.

We therefore hold that the Constitution of the United States and the laws of the United States, which are not otherwise inapplicable, are in force and effect in the Virgin Islands.

## IV

■■ We now turn to the fourth question raised in this case, i.e., Is the Nineteenth Amendment (of the U. S. Const.; prec. 1 V.I.C.) operative upon the power of Congress to legislate for the Virgin Islands? We hold that the Nineteenth Amendment does restrict the power of Congress to legislate for the Virgin Islands.

The Nineteenth Amendment reads as follows:

"The right of citizens of the United States to vote shall not be denied or abridged by the United States or by any state on account of sex. Congress shall have power to enforce this article by appropriate legislation."

This amendment is self-executing (Foster v. College Park, 155 Ga. 174. See also United States v. Reese, 92 U.S. 214, 23 L. Ed. 563; Neale v. Delaware, 103 W.* 370;

*So in original.

Quinn v. United States, 238 U.S. 347, 35 S. Ct. 926, 59 L. Ed. 1340. (Although these cases refer to the Fifteenth Amendment, the principles of Constitutional interpretation are applicable to the Nineteenth Amendment as well. Lesser v. Garnet, 258 U.S. 130, 42 S. Ct. 217, 66 L. Ed. 505).

As the legislative power of the United States is exercised by the Congress of the United States, any prohibition upon the legislative power of the United States is a prohibition upon the Congress of the United States. The Congress of the United States, therefore, cannot enact legislation which is contrary to the Nineteenth Amendment, nor can it continue in existence, existing legislation which is contrary to the Nineteenth Amendment.

The Virgin Islands as an organized territory of the United States is subject to the legislative power of the Congress of the United States. When the Act of March 3, 1917 (supra), was passed there was no prohibition upon Congress in the Constitution of the United States which prevented Congress from adopting and continuing in existence (by section 2; 48 U.S.C. § 1392), the election laws in the Amalienborg Code of 1906 (Colonial Law of Apr. 6, 1906, §§ 14-27; prec. 1 V.I.C.), which deny the right of women citizens in the Virgin Islands to exercise the elective franchise. But when the Nineteenth Amendment was adopted the power of Congress to continue discriminations on account of sex was destroyed so far as the right of citizens of the United States to vote was concerned.

The effect of the Nineteenth Amendment is to prohibit discriminations on account of sex in any legislation passed to regulate the right of citizens of the United States to vote (State v. Mittle, 120 S.C. 526, 113 S.E. 335, cert. denied 260 U.S. 705, 744, 43 S. Ct. 164, 67 L. Ed. 473).

We now turn to the next question in this case; i.e., are women entitled to the right to vote in the Virgin Islands under the provisions of section 18 of the Amalienborg Code (Colonial Law of Apr. 6, 1906, § 18 (prec. 1 V.I.C.).

Section 18 reads as follows:

"The franchise or right of voting is vested in every man of unblemished character, who has the Right of Nativity or has resided in the Danish West India Islands for 5 years, who has attained the age of 25 years, who has not been legally deprived of the management of his property, and who either owns a property in the municipality that is calculated likely to yield a yearly rent of at least 300 Francs in St. Croix and St. Jan and of at least 700 Francs in St. Thomas, or in the preceding year has had a clear annual income of 1500 Frcs. He must, moreover, have resided at least 2 years in the municipality and 6 months within the elective district in which he sojourns at the time the election takes place, and his name must be on the list of persons entitled to vote. A person having residence in several elective districts can determine in which of them he will exercise his right of voting.

"No person can be considered of an unblemished character who by judgment of the Court has been found guilty of an act ignominious in the public opinion.

"Within 10 years from the entering into operation of this law the provisions concerning franchise contained in this [printed sign for number] are to be revised."

It would be recalled that section 2 of the Act of March 3, 1917 (supra), states that only so much of the election laws of the Amalienborg Code of 1906, should be in force and effect as is "compatible with the changed sovereignty." We have dealt with the relation of this condition to the provisions of section 18 of the Amalienborg Code of 1906 in a former decision (Edith Williams et al., v. Elective Board of Town and Country District of St. Thomas, No. 14-1935, St. Thomas), in which we said:

"Whether Section 18 of the Amalienborg Code of 1906 is compatible with the changed sovereignty or not de-

pends on the meaning and scope of the word 'man' as found in the provisions of the Amalienborg Code. (For Danish Text see Laws and Ordinances for the year 1906, No. 124. For official English translation see Colonial Law No. 124, 1906, Government Printing Office, St. Thomas, 1924). If that word is construed in its narrow sense to denote the masculine sex and to refer to males only, then Section 18 is both incompatible with the changed sovereignty and is in direct conflict with the provisions of the Nineteenth Amendment to the Constitution of the United States. If, however, the word 'man' is construed in its generic sense so as to connote persons rather than males, then Section 18 would be compatible with the changed sovereignty and would be consonant with the Nineteenth Amendment.

 "It is now beyond question that it is an ideal of American government and a principle of American law that men and women are to be placed upon an equal footing under the law (Atkins vs. Children's Hospital, 261 U.S. 525 [43 S. Ct. 394, 67 L. Ed. 785]). Women have always been permitted to acquire American citizenship upon practically the same conditions as men (Minor vs. Happersett, 21 Wall. 162 [22 L. Ed. 627]; the Fourteenth Amendment to the Constitution of the United States; Naturalization Laws, U.S. Code, Title 8).

"After a period of fluctuating policies (compare the Act of March 26, 1790, 1 Stat. 133; Act of January 29, 1795, 1 Stat. 414; Act of April 14, 1802 [ch. 28], 2 Stat. 153; Act of February 10, 1855 [ch. 71], 10 Stat. 604; Act of March 2, 1907 [ch. 2534], 34 Stat. 1228; Act of September 22, 1922 [ch. 411], 42 Stat. 1021; Act of May 24, 1934 [ch. 344], 48 Stat. 797;) the United States is now definitely committed to the principles of equal rights to men and women in all matters relating to citizenship (Act of May 30 [24], 1934 [ch. 344], 48 Stat. 797; Pan-

American Treaty, Montevideo, 1934), so that if the phrase: 'the right to nativity' as used in Section 18 of the Amalienborg Code of 1906 means citizenship, as I believe it does (compare Danish Text with English translation and with Brynildsen Danish-English Dictionary, Volume 1, 'Indfodsret'), then women must be placed upon an equal footing in regard to citizenship, because a Treaty is the supreme law of the land (U.S. Constitution, Article 6, Cl. 2; Foster vs. Neilson, 2 Pet. 314), and is binding on this Court (Ibid., supra). Paragraph one of Article 6 of the Treaty between the United States and Denmark [1916 (prec. 1 V.I.C.), 39 Stat. 1706; proclaimed 1917], by means of which the United States acquired the Virgin Islands, extends equal rights to all Danish citizens who reside in the Virgin Islands whether these citizens are men or women. In these Treaties, Danish citizens are given equal rights without regard to whether they are men or women. (See Malloy Treaties, Vol. 2, p. 373, et seq.) 'The most favored nation clause' in the Treaties between the United States and various foreign countries extends the same idea of equality to the sexes to those aliens who reside within the Virgin Islands and who come within the provisions of Section 18 of the Amalienborg Code of 1906 (See for example, of most favored nation clauses, Treaties cited in Treaty Information Bulletin, No. 39, Supplement, pages 91 to 107).

██ "In regard to the right to vote, the principle of equality between sexes is definitely established 'by the legislative history of the long battle for universal and equal suffrage which resulted in the adoption of the Nineteenth Amendment to the Constitution of the United States. In the light of the history of our country, there can be no gainsaying the fact that when the People of the United States adopted the Nineteenth Amendment and declared that neither the United States nor any State

340

can deny or abridge the right to vote on account of sex, they clearly established as a principle of our government that women should be allowed to vote on the same conditions as men are allowed to vote.

"It would, therefore, be incompatible with the 'changed sovereignty', because it is incompatible with American ideals, to continue after August 26, 1920, when the Nineteenth Amendment was ratified, any denial of the right to vote simply because the persons to whom the right to vote was denied were women. I, therefore, hold that if the word "man" must be construed so as to refer to males only, then Section 18 of the Amalienborg Code of 1906 would not be compatible with the changed sovereignty and would be in conflict with the Act of March 3, 1917 after August 23, 1920."

We reaffirm our statement in that case.

 In the Williams case above-cited we also dealt at great length with the relationship of the Nineteenth Amendment to section 18 of the Amalienborg Code. There we said that if we were compelled to translate the Danish word "mand" to be "male", or be compelled to construe the word "man" as found in the official English translation of section 18 to denote only males we would be compelled to hold that section 18 ceases to be in force and effect on August 26, 1920, when the Nineteenth Amendment was adopted. This would necessarily be so because the amendment by its own force and effect strikes out the word "male" in all statutes and in all constitutions which restricted the right to vote to males only. (Graves v. Eubank, 205 Ala. 174; State v. Mittle, 120 S.C. 516; Stephens v. Ball Ground School District, 153 Ga. 690; In re Opinions of the Justices, Mass.* 601; In re Opinions of the Justices, 130 Atl. 180 (N.H. 1927); People v. Holmes, 341 Ill. 23; Prewitt v. Wilson, 242 Ky.

*So in original.

231; State v. Gray, 107 Fla. 53; Cleveland, Etc., Railway v. Wehmeier 330, App. 475*).

█ Such an interpretation would literally wipe out section 18 of the Amalienborg Code of 1906, and make chaos of the election laws of the Virgin Islands. We do not believe that we shall take, nor that we are forced to take, such an extreme position. If, without doing violence to the language of section 18, a liberal construction of the word "man" as used in section 18 will permit us to save that section and to establish its constitutionality we may, and indeed we must, adopt that liberal construction. For where one interpretation of a statute renders a statute unconstitutional, and a second interpretation conserves the statute as constitutional, we must adopt the second construction. (Grenada County v. Brogden, 112 U.S. 261, 5 S. Ct. 125, 28 L. Ed. 704; McCullough v. Va., 172 U.S. 102, 19 S. Ct. 134, 43 L. Ed. 382; New York Central R.R. v. United States, 212 U.S. 481, 29 S. Ct. 304, 53 L. Ed. 613; Phelps v. United States, 274 U.S. 341, 47 S. Ct. 611, 71 L. Ed. 1083; Black on Interpretation of Statutes, page 113.)

█ In the first place we can interpret the word "man" in its generic sense so as to mean "person" and thus include all citizens of the United States whether they be men or women. We have made a careful analysis and comparative study of this point in the Williams case cited above. There we said:

"The word 'man' as used in Section 18 can be taken in its generic sense so as to include females as well as males. It is synonymous with the word 'person'. This is true in the Danish language as well as in the English language, and it is reasonable to believe that it was so used in Section 18. For the Danish word used in the first phrase of the first paragraph of Section 18 is 'mand'. This connotes 'man' in its generic sense as

*So in original.

342

meaning 'person' as well as it denotes an individual of the masculine sex (Larsen, Danish-English Dictionary, 'mand', plural 'maend'). The English translation for 'mand' is not 'male'. The word for 'male' is 'mandig' (Brynildsen, English-Danish Dictionary, 'male').

"The broad construction of the word 'mand' so as to have it mean 'person' is supported by the language in other sections of the Amalienborg Code. Thus Section 31 of the original Danish text of the Amalienborg Code contains the following sentence:

" "Sec. 31 *De Maend* som ere blevne valgte, skal der er Valgbestyrelsens Formand streks meddeles skriftlig Underretning on deres Valg.'

"The official translation of the same sentence is as follows:

" 'The persons thus elected are immediately to be notified thereof in writing by the chairman of the Elective Board.'

"It is thus seen that the word 'maend', which is the plural of the word 'mand', as found in Section 18, is translated as being *'persons'*.

"Furthermore, Section 37 in the original Danish text reads as follows:

" 'Sec. 37. Guvernoren kan enten personligen eller ved en dertil befuldmaegtiget overvaere Kolonialradets Moder .og tage Ordet, saa ofte han eller den befuldmaegtigede anser det fornodent. Ligeledes kunnede tilkalde *Maend* til at overvaere. Fornandling erne og under samme at give de Oplysninger og Forklaringer, som de forekemmende Sager foranledige.

" 'Alle Meddelelser mellem Regeringen og Raadene ske gennem Guvernoren.'

"The official translation of this paragraph reads as follows:

" 'Sec. 37. The Governor may either personally attend the meetings of the Colonial Council, or may depute another person to represent him at such meetings, and he or the person deputed may address the Council as often as they may think proper.

They may likewise summon *persons* to be present at the meetings in order to give such information or explanations, as the matters under consideration may require.

"'All communications between the Home Government and the Councils shall be carried on through the Governor.'

"It would, therefore, be seen that in the second sentence of the section, the word 'maend' has been translated as 'persons'. It is entirely clear that it could not have been the intention of the compilers of the Amalienborg Code to deny the power to the Colonial Council to call upon 'women' to give such information and explanation as may be required. The word 'maend' is naturally and properly used in its broad sense to include 'females' as well as males.

"This construction is not negatived by the language of Section 82. The original Danish text of Section 82 is as follows:

"'Sec. 82. Enhver vaabenfor *Mand* or forpligtet til med sin *Person* at bidrage til Oernes Foravar, for saa vidt ikke undersaatligt Baand til en fremmed Stat undskylder ham, saavel som til Opretholdelsen af offentlige Fred, after de naermore Bestemmelser, ·som Loven og Anordningerne.

"'Enhverer pligtig til at eeltage i Beskyttelsen ar Ejendemme imod Ildsvaade, paa den Maade som Anordningerne foreskrive.'

"The official translation of Section 82 is as follows:

"'Sec. 82. Every *man* capable of bearing arms is bound in *person* to contribute towards the defence of the islands, provided his ties of allegiance to a foreign state do not excuse him, as well as towards the maintenance of public peace, according to the enactments contained in the Laws and Ordinances.

"'Every person is bound to aid in the protection of property against fire, in the manner prescribed by the Ordinance.'

"It will be noted that the word 'mand' has been translated by the word 'man'. But under the laws of the United States women are also under a duty to bear arms in the defense of the country (United States vs. Schimmer,

344

279 U.S. 644. They did so in the world war when women served as yoemen. Women serve in the armed forces of the United States at the present time (U.S. Code, Title 10, Sec. 164 et seq.).

"Furthermore, women are certainly not excused from obeying the laws relating to the maintenance of the public peace under the provisions of Section 82. In addition, it should be noted that the Danish text used the word 'Person'. This means 'individual' (Larsen, Danish-English Dictionary, 'Person'). It is, therefore, reasonable to suppose that the word 'mand' as used in Section 82 was also used in its inclusive sense. This idea is supported by the language in the second sentence of Section 82. The construction is also supported by the phrasing found in Section 19, Section 31, and Section 32. In each of these sections the word 'person' is used in the English translation. That word, of course, includes both men and women.

■-■ "It is the common practice in the law of the interpretation of a statute that a statute should be interpreted in its entirety (Ross vs. McIntyre. 140 U.S. 453 [11 S. Ct. 897, 35 L. Ed. 581]), as I am doing. Furthermore, if I follow, as I must follow, the principle that a statute must be sustained as constitutional wherever reasonably possible (McCullough vs. Virginia, 172 U.S. 102 [19 S. Ct. 134, 43 L. Ed. 382]; N.Y.C. R.R. vs. United States, 212 U.S. 481 [29 S. Ct. 304, 53 L. Ed. 613]; Parsons vs. Bedford, 3 Pet. 433 [7 L. Ed. 732]; United States vs. Coombs, 12 Pet. 72 [9 L. Ed. 1004]; Hooper vs. California, 155 U.S. 648 [15 S. Ct. 207, 39 L. Ed. 297]; Phelps vs. United States, 274 U.S. 341 [47 S. Ct. 611, 71 L. Ed. 1083]; Knights Templars', Etc., Co. v. Jarman, 187 U.S. 197 [23 S. Ct. 108, 47 L. Ed. 139]) I am constrained to give a broad interpretation to the word 'man' because if we relate the word 'person' (ingen) as found in Section

18, sentence two, back to the word 'mand' as found in sentence one of Section 2 [82?], I must find that the entire Section 18 is unconstitutional. But if I construe the word 'mand' in its inclusive sense, I can then relate the word 'person' (ingen) back to the word 'mand' and so save the entire section.

"Furthermore, it would not be an innovation in the law of the Virgin Islands to interpret masculine words so as to connote feminine persons. The laws of St. Thomas and St. John provide for just such interpretation and usage (Code [1921] of St. Thomas and St. John [also Code 1921, St. Croix], Title IV, Chapter 13, Section 2). No violence is done to the language or meaning of Section 18 by holding the word 'mand' is used in its generic sense so as to include females as well as males."

Since the decision was handed down further research has confirmed the opinion.

We have found complete support in the writings of Viggo Bentzon, an eminent legal authority in Danish Law, and formerly a Judge of one of the highest Courts in Denmark, and who has written extensively on the equality of the sexes in Danish Law (See "Personretten", Paragraph 2, pages 9-13).

 We therefore reaffirm our holding in the Williams case: That women who are otherwise qualified under the provisions of section 19 [18?] of the Amalienborg Code of 1906 are lawfully entitled to vote in the Virgin Islands at elections for members of the Colonial Council. We also reaffirm our holding in the case that such qualified women can, of right, demand that they be registered as qualified voters in accordance with the provisions of section 22 and section 23 of the Amalienborg Code of 1906.

## VI

We now turn to the question as to whether or not the plaintiffs have a speedy and adequate remedy under the

election laws, and so are not entitled to a peremptory writ of mandamus. This question was pressed upon us with great earnestness by the defendant Jackson, as Chairman of the Electoral Boards in his own behalf. The question merits careful attention. It calls for a complete and detailed analysis of section 25 and section 26 of the Amalienborg Code of 1906 (Colonial Law of Apr. 6, 1906; prec. 1 V.I.C.).

We must also consider the ordinances connected with these sections, and the relative provisions in the Act of March 3, 1917 (supra). Section 25 prescribes the method of procedure by which corrections may be made of errors, of inclusion or exclusion, that exist in the election list as framed, exhibited and corrected by the Elective Board.

Those persons who believe that the name of another person has been improperly included in the election list may, from February 15 to February 28, inclusive, send a written demand to the Chairman of the Elective Board that "the name of another person" which has been erroneously entered on the election list "be stricken out." The demandant must give a brief statement of the reasons on which he bases his demand. The latest date on which the demand may be presented to the Chairman of the Elective Board is February 25.

Within 14 days after the demandant's request has been received by the Chairman of the Elective Board, the Elective Board must hold a public meeting at which "meeting" "the objections thus made against the list" and "the questions mooted are to be decided." To this meeting the person or persons by whom the objections were made "must be summoned." The person concerning whom the objections are made must also be summoned to the public meeting. The Chairman must send a copy of the demandant's request to the person concerning whom the objection is made. Either party may produce documents

347

and witnesses. Upon the testimony thus brought forward and upon any other information, which has been secured by the Chairman of the Elective Board, the Elective Board must make its decision. The decision must be announced at the public meeting. It must be entered briefly in the minutes of the Elective Board.

It is specially to be noted that all of the deliberations of the Elective Board in this matter must be held in public. That the decision must be reached in public and that the decision (award) must be entered on the minutes of the Elective Board (the Election Protocol) while the public meeting is still in session. The election list as corrected must be signed by the entire Elective Board.

If the decision is given against the demandant the matter is closed. No right of appeal is given to him by the Election Laws.

If, however, the decision is given in favor of the demandant and the name of the person objected to is taken from the election list that person could have formerly taken an appeal from the Elective Board's decision to th courts (section 26). The appeal would be "prosecuted in the West India Upper Court." No costs or fees were to be assessed. An attorney would be appointed to defend the Elective Board. By whom the appointment was to be made is not stated in the election laws. The judgment made by the West India Upper Court was final.

If the appellant should obtain "a judgment warranting his right of voting, his name shall be entered on the list on his presenting a copy of the judgment" (section 26). But this method of appeal is no longer available. By the law of March 22, 1907, the West India Upper Court was abolished. In the law, however, it was provided that appeals from the decision made by the Elective Board could be taken to an Appeal Board, which was composed of the Government Secretary and three

Police Court Judges, but the Police Court Judge who was Chairman of the Elective Board from whose decision the appeal was taken was disqualified to serve. The clear intention of the statute was to have the appeal decided by the Government Secretary and two Police Court Judges, but no procedure is prescribed for carrying out the provisions of the law of March 22, 1907.

Further, it is impossible to carry out the provisions of this law because there are no longer two Police Court Judges available to serve. There is only one. This is so because there are no longer two Police Court Judges in St. Croix. There is only one such Judge. He is Chairman of all of the Elective Boards in St. Croix. He is disqualified to serve on the Appeal Board in any appeal cases taken from the St. Croix Elective Boards. Similarly the Police Court Judge in St. Thomas is Chairman of the Elective Board in St. Thomas. He is disqualified to serve on the Appeal Board in any appeal cases taken from the Elective Boards in St. Thomas. A proper Appeal Board under the law of March 22, 1907, cannot be convened. Furthermore, there are no provisions in section 26 as modified by the law of March 22, 1907, which permit of an appeal to the Courts.

There is, in the election laws themselves, therefore, no remedy of any sort, in fact, available to any person, who may feel aggrieved by the action of the Elective Board in refusing to place his name on the election list.

Furthermore, the practical difficulties of taking an appeal are very great. The persons who are aggrieved by the action of the Elective Board in St. Thomas must carry their appeal to the Island of St. Croix, or else the Police Court Judge in St. Croix must come over to St. Thomas. When the difficulties of transportation across the open waters for a distance of over forty miles are considered, it becomes obvious, that the appeal of an ag-

grieved person to the Appeal Board is practically nonexistent.

A similar situation would exist for a person in St. Croix who would be compelled to carry his appeal to St. Thomas.

█ It is entirely contrary to American principles of justice to leave a citizen of the United States without any legal remedy for the loss of his political rights which may be taken away from him by the arbitrary or illegal action of an Elective Board. Due process of law requires that every citizen of the United States have an opportunity to protect and defend his legal political rights in a court of competent jurisdiction.

██ We are therefore compelled to hold that section 26 of the Amalienborg Code of 1906 as amended by law of March 22, 1907, "is not compatible with the changed sovereignty" as required by the Act of March 3, 1917 (supra), and therefore, we hold that section 26 of the Amalienborg Code of 1906 as amended by the Act of March 22, 1907, is not in force and effect. Consequently, there is no adequate and speedy remedy available at law to the petitioners in this case. They properly invoked the power of this court to issue a writ of mandamus (Code of St. Croix [1921], Title III, chapter 53, section 2 [5 V.I.C. § 1361]).

A petition for a writ of mandamus is the proper legal action to correct errors made by the Elective Boards, when those Boards are functioning under the provisions of section 25 of the Amalienborg Code of 1906 (Edith Williams, et al. v. The Elective Boards of the Town and Country Districts of St. Thomas No. 14 - 1935, St. Thomas).

█ Applying the foregoing principles to the facts in the first case we find that the petitioners are citizens of the United States; that they meet all requirements of qualified electors as laid down by section 18 of the Amalienborg Code of 1906; that they are qualified to vote

at elections for members of the Colonial Council, of St. Croix; that their names should have been placed upon the election lists of the respective elective districts in Frederiksted; and that their names were illegally omitted from those election lists. They are entitled to a peremptory writ of mandamus directed against the Elective Boards for the respective elective districts in the town and country district of Frederiksted. The writ will issue.